# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

_____

In re:                                                        BKY No.:  09-50779

Dennis E. Hecker,                                                        Chapter 7

                    Debtor.

_____

                                                        Adv. Case No.:  09-5042

Randall L. Seaver, Trustee,

                    Plaintiff,                    **TRUSTEE'S RESPONSE TO
                                                 DEBTOR'S MOTION FOR STAY
                                                 OF ADVERSARY PROCEEDING**

vs.

Jacob Holdings of Ventanas LLC,
Jacob Properties of Minnesota LLC,
Wells Fargo Bank, Cornerstone Bank,
and Chrysler Financial Services Americas, LLC,

                    Defendants.

_____

        Randall L. Seaver, Trustee ("Trustee"), by and through his undersigned counsel, submits

this Response to the Motion of the Debtor, Dennis E. Hecker, for Order Staying Adversary

Proceeding Until Conclusion of Grand Jury Proceeding and/or any Indictments the Grand Jury

Issues.  The Debtor seeks a stay of this adversary proceeding until the conclusion of any criminal

proceeding against him.

        The Debtor's Motion should be denied for the following reasons: 1) the Debtor lacks

standing to seek a stay of this adversary because he has no financial stake in the Trustee's action

related to a multi-million dollar condominium located in San Jose del Cabo, Mexico (the "Real

Estate"); 2) the Debtor has waived his Fifth Amendment rights with regard to the subject matter

of the adversary as he answered numerous questions about the Real Estate at his 341 meeting; 3)

an order staying the adversary for the alleged purpose of safeguarding the Debtor's Fifth

Amendment rights would be premature as the Debtor has yet to assert those rights; and 4) the Debtor cannot establish a legal and factual basis for staying the adversary proceeding.

## FACTUAL BACKGROUND

1.      The Debtor filed for bankruptcy relief under Chapter 7 of the Bankruptcy Code on June 4, 2009 and obtained the benefit of the automatic stay of 11 U.S.C. §362.

2.      On or about June 17, 2009, state and federal authorities searched the Debtor's business and homes in Medina and Crosslake, Minnesota pursuant to a search warrant.

3.      The Debtor filed his Schedules and Statement of Financial Affairs on July 1, 2009.

4.      The Debtor scheduled Wells Fargo Bank as a secured creditor with a lien of $650,000 against "an unknown portion of Furnishings and Household Goods in the Las Ventanas Unit 3103, Los Cabos, Mexico."

5.      On July 8, 2009, a creditor, Chrysler Financial Services Americas, LLC ("Chrysler"), filed a complaint against the Debtor, *Chrysler Financial Services Americas, LLC v. Hecker*, ADV No. 09-5019, alleging false pretenses, false representation, actual fraud, fraud as fiduciary, embezzlement, larceny and willful and malicious injury, and seeking an order determining that its debt to be non-dischargeable under 11 U.S.C. §523(a)(2), (4) and (6).  Other creditors have filed several other adversary proceedings seeking orders for non-dischargeablilty of debt.

6.      On July 15, 2009, the Debtor testified at the meeting of creditors conducted pursuant to 11 U.S.C. §341 and answered numerous questions about the Real Estate.  *See* Transcript of 341 Meeting of Creditors at 37, 75-77, 110-111, attached as Exhibit A to the Affidavit of Matthew R. Burton (hereinafter "Burton Affidavit"), filed herewith.

7.     The Debtor did not assert his Fifth Amendment privilege against self-incrimination with regard to any questions asked at the Section 341 Meeting.

8.     On July 30, 2009, the U. S. Attorney served a "Subpoena to Testify Before the Grand Jury upon Denny Hecker's Automotive Group, Inc." and any other entity owned or controlled by Dennis E. Hecker.

9.     On September 16, 2009, the Trustee filed this adversary complaint, alleging various causes of action seeking the following: 1) declaratory judgment that the Real Estate is bankruptcy estate property; 2) avoidance of the unperfected mortgage of Wells Fargo Bank against the Real Estate; 3) avoidance of a fraudulent transfer and a constructive fraudulent transfer of an interest in the Real Estate to Wells Fargo Bank; and 4) the turnover of the Real Estate to the Bankruptcy Estate.

10.     On October 7, 2009, the Debtor filed a Motion for Order Staying Adversary Proceeding Until Conclusion of Grand Jury Proceeding and/or any Indictments the Grand Jury Issues in this adversary proceeding and in eight other adversaries: *Cornerstone Bank, et al. v. Hecker, ADV. No.09-5035; Carleton Financial Corporation v. Hecker,* ADV No. 09-5036*; Vision Bank v. Hecker,* ADV No. 09-5037*; Alliance Bank v. Hecker,* ADV No. 09-5038*; Gelco Corporation v. Hecker ,* ADV No. 09-5039*; US Bank v. Hecker,* ADV No. 09-5040*; Hyundai Capital America v. Hecker,* ADV No. 09-5041*;* and *Seaver v. Hecker, Midwest Motors, LLC*, et al., ADV No. 09-5045.

**ARGUMENT**

I.  **THE DEBTOR'S MOTION TO STAY THIS ADVERSARY PROCEEDING MUST BE DISMISSED AS THE DEBTOR LACKS A FINANCIAL STAKE IN THE OUTCOME AND HAS NO STANDING.**

As the Debtor has no financial stake in this adversary proceeding, he lacks standing to seek a stay of the litigation.  "The question of standing generally challenges whether a party is a proper one to request the adjudication of a particular issue." *Yates v. Forker (In re Patriot Company)*, 303 B.R. 811, 815 (8th Cir. BAP 2004) *citing Nangle v. Surratt-States (In re Nangle)*, 288 B.R. 213, 216 (8th Cir. BAP 2003).  The Supreme Court articulated three elements that a party must establish the requisite standing to participate in a lawsuit in an Article III court in the case, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992):

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' "Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.*, 504 at 560-61(citations omitted); *see also, Blumeyer v. Sosne (In re Blumeyer)*, 383 B.R. 457, 461 (8th Cir. BAP 2008.)

Standing in the bankruptcy court is narrower than standing in Article III courts, particularly in an avoidance action where the trustee is the real party in interest who has the capacity to sue and be sued.  *See* 11 U.S.C. §323(b).  Once a trustee is appointed, the authority to bring avoidance actions regarding estate property rests solely with the trustee and the debtor lacks standing to bring such actions.  *See, In re Downwood Properties/78*, 209 F. 3d 114, 116 (2nd Cir. 2000); *Vreugdenhil v. Hoekstra,* 773 F.2d 213, 215 (8th Cir. 1985).  The causes of action a trustee undertakes with his avoiding powers are property of the estate and do not involve rights

unique to the debtor.

In the rare case where sufficient estate assets are recovered to provide a surplus which reverts to the debtor, the debtor may have the requisite pecuniary interest in an avoidance action. "If the debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has shown a pecuniary interest and has standing to object to a bankruptcy order." *Williams v. Marlar, et al. (In re Marlar)*, 252 B.R. 743, 748 (8th Cir. BAP 2000) *citing In re Schultz Mfg. Fabricating Co.,* 956 F.2d 686, 692 (7th Cir. 1992); *In re Andreuccetti,* 975 F.2d 413, 416 (7th Cir. 1992); *cf., In re Middendorf*, 381 B.R. 774, 776 (Bankr. D. Kan. 2008) (debtors with pecuniary interest in proposed settlement had standing to object).

Here, the Debtor cannot show that he has the requisite standing to bring a motion in this avoidance action. The Debtor cannot meet his burden of showing that: 1) he has suffered an injury in fact as a result of the proceeding; 2) there is a causal relationship between the injury and the Trustee's pursuit of the avoidance action; and 3) that the injury will be redressed by the stay of the adversary proceeding. *See, Blumeyer,* 383 B.R. at 461, *citing Lujan*, 504 U.S. at 560-61. The Debtor cannot show that he is or will be an aggrieved person as a result of this adversary proceeding, as he cannot establish that he will be "directly and adversely affected pecuniarily by the [outcome]". *See, Yates v. Forker*, 303 B.R. at 811 (insolvent debtor corporation's principal shareholder lacked standing to object to settlement compromise). A surplus of assets is unlikely in this case where the Debtor's schedules list assets of $18,509,972 and liabilities of $766,754,240. Therefore, the Debtor's Motion to Stay this adversary proceeding must be denied.

II.    **THE DEBTOR'S MOTION FOR A STAY TO PRESERVE HIS FIFTH AMENDMENT RIGHTS IS PREMATURE AS THE DEBTOR HAS YET TO ASSERT HIS RIGHTS IN RESPONSE TO ANY QUESTION OR IN ANY DOCUMENT OR FILING WITH THE BANKRUPTCY COURT.**

The Fifth Amendment privilege against self-incrimination applies in the bankruptcy context. *See, Martin Trigona v. Belford (In re Martin Trigona),* 732 F.2d 170, 175 (2d Cir.1984). Before he has the right to remain silent, a debtor must assert the Fifth Amendment, the bankruptcy court must evaluate the facts and question posed, and must determine if the debtor has a well founded fear of self incrimination. *See, In Re Morganroth,* 718 F.2d 161, 167 (6th Cir.1983). As the Court stated in *In re Connolly*, 59 B.R. 421 (Bankr. N.D. Il. 1986):

> Only the [debtor] knows whether the ... disclosure sought may incriminate him[.]" *Garner v. United States,* 424 U.S. 648, 655, 96 S.Ct. 1178, 1183, 47 L.Ed.2d 370 (1976). And he bears the burden of demonstrating he has "reasonable cause to apprehend a real danger of incrimination." *In Re Morganroth,* 718 F.2d 161, 167 (6th Cir.1983) *citing Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Generally, if an answer to a question, on its face, requires an admission of crime, that he supply evidence of a necessary element of a crime, or furnish a link in the chain of evidence needed to prosecute, the debtor faces a real danger of prosecution. *In Re Morganroth,* 718 F.2d at 167. . . .Before this Court can consider much less sustain Connelly's assertions, he must come forward with some minimal credible reasons why each of the many disclosures required of him to administer this case pose some real and not imaginary threat of incrimination. *See Martin-Trigona v. Gouletas,* 634 F.2d 354, 360 (7th Cir.) *cert. denied,* 449 U.S. 1025, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980).

*Id.* at 432.

The Debtor has not asserted his Fifth Amendment privilege with regard to any particular question or document, in this adversary proceeding or in any other proceeding in this bankruptcy case. Any assessment of the underlying factual basis for a potential Fifth Amendment claim would be purely speculative. Therefore, the Motion to Stay the Adversary Proceeding to protect the Debtor's Fifth Amendment Rights is premature and should be denied.

### III.   THE DEBTOR WAIVED HIS FIFTH AMENDMENT PRIVILEGE BY ANSWERING NUMEROUS QUESTIONS REGARDING THE REAL ESTATE AT SAN JOSE DEL CABO AT HIS SECTION 341 MEETING.

In this voluntary Chapter 7 bankruptcy proceeding, the Debtor appeared at the §341 meeting and answered questions under oath about the Real Estate which is the subject of this adversary proceeding.  Before the Debtor filed his schedules and statement of financial affairs and provided sworn testimony at the §341 meeting, law enforcement officials had executed search warrants at both properties occupied by the Debtor and the Debtor's business.

At the 341 Meeting, the Debtor answered all of the Trustee's various questions regarding the Debtor's ownership of the limited liability corporations that hold title to the Real Estate, the purchase price, the furnishings, the encumbrances against the property and an estimate of current value.  At no point did the Debtor assert his Fifth Amendment privilege.  *See* Transcript of 341 Meeting of Creditors at 37, 75-77, 110-111, Exhibit A to Burton Affidavit. A debtor must assert his Fifth Amendment privilege in a timely manner or be deemed to have waived the privilege by answering questions on a give topic.  *See, Garner v. United States,* 424 U.S. 648, 654-55 (1976). Now that the Debtor has testified freely about the facts surrounding the acquisition and use of the Real Estate, he cannot now assert the Fifth Amendment privilege with regard to this asset.  *See, Krasny v. Gi Yeong Nam (In re Nam)*, 245 B.R. 216, 231 (Bankr. E.D. Pa. 2000).

### IV.   THE DEBTOR HAS NOT ESTABLISHED A LEGAL OR FACTUAL BASIS FOR STAYING THIS ADVERSARY PROCEEDING.

The Debtor complains that he is faced with the unfair choice of defending himself in this adversary proceeding or exercising his Fifth Amendment right to remain silent, whereupon the Bankruptcy Court can draw negative inferences from his failure to testify.  In the absence of a specific question or line of inquiry directed to the Debtor, this assertion is based on pure speculation and is not a basis to stay the litigation in the adversary complaint.

A.    Having Voluntarily Filed for Bankruptcy Relief, the Debtor May Have to Choose
Between the Right to Remain Silent and a Discharge of Debt

As the Debtor voluntarily filed this bankruptcy case seeking the equitable relief of discharge of debt, he may be compelled to choose between asserting his rights under the Fifth Amendment and remaining silent, or alternatively, the discharge of a debt.  The discharge of debt and "the relief of a fresh start is intended to benefit the honest debtor." *In re Lederman*, 140 B.R. at 53, *citing State Bank of India v. Chachra (In re Chachra),* 138 B.R. 397, 401 (Bankr. S.D.N.Y. 1992) (complete disclosure is a condition precedent to grant of discharge).  "A fact finder in a civil proceeding may to draw negative inferences from a defendant's invocation of the Fifth Amendment privilege." *National Acceptance Corp. v. Bathalter,* 705 F.2d 924, 929-30 (7th Cir. 1983).  "[A]n individual debtor in a bankruptcy case, who is also a target of criminal investigation, might be required to relinquish a fifth amendment privilege against self-incrimination in order to avoid losing a discharge in bankruptcy." *Amsave Credit Corporation v. Marceca (In re Marceca)*, 131 B.R. 774, 778 (Bankr. S.D.N.Y. 1991); *see also*, *In re Vrusho*, 321 B.R. 607, 612 (Bankr. D. N. H. 2005); *Raymond James & Assoc. v. Metzgar (In re Metzgar),* 127 B.R. 708, 711 (Bankr. M.D. Fla. 1991).

> [A] debtor cannot enjoy the benefits of the bankruptcy process while avoiding its burdens. Any other approach would produce an unlevel playing field tilted in the debtor's favor. . . .The debtor cannot use the bankruptcy court to broaden the benefits afforded to an accused by the Fifth Amendment. To do so would allow the debtor to use the Fifth Amendment as a shield, while impermissibly using the Bankruptcy Code as a sword with which to take an unfair advantage of creditors. *Piperi v. Gutierrey (In re Piperi),* 137 B.R. 644, 647 (Bankr. S.D. Tex. 1991).

*In re Lederman*, 140 B.R. at 53.  From the plain statutory language, the *Lederman* Court inferred that, absent a grant of immunity, the Code does not intend to protect a debtor's right or opportunity to the discharge a particular debt.  The *Lederman* Court stated further,

> Moreover, in §727(a)(6)(B), Congress specifically preserved a debtor's rights to raise the privilege against self-incrimination, absent a grant of immunity, with respect to oral examination and testimony without prejudice to the right to a discharge. The lack of a similar provision in §523 leads to the inescapable conclusion that none was intended.
>
> Moreover, in §727(a)(6)(B) Congress specifically preserved a debtor's rights to raise the privilege against self-incrimination, absent a grant of immunity, with respect to oral examination and testimony without prejudice to the right to a discharge. The lack of a similar provision in §523 leads to the inescapable conclusion that none was intended.

*Id.* at 53.  Although an individual has a right against self-incrimination, a debtor may have to choose between the constitutional right to remain silent and the equitable relief of discharge of debt.

      B.    <u>There Is No Constitutional Mandate That a Bankruptcy Court Stay an Adversary Proceeding.</u>

In his Motion for a Protective Order, the Debtor seeks a stay of this adversary proceeding until any criminal proceeding is concluded, which may take years.  The Debtor cites several non-bankruptcy cases where a defendant in a civil action sought a stay of litigation while a parallel criminal investigation or litigation was proceeding.  *See, e.g., Doe v. City of Chicago*, 360 F. Supp. 880 (N.D. Ill 2005); *Bridgeport Harbour Place I, LLC v. Ganim*, 269 F. Supp. 2d 6 (D. Conn. 2002).  In some cases, courts have concluded that the ongoing civil litigation could compromise the defendant's ability to assert and obtain protection under the Fifth Amendment privilege in the federal matter.  Similarly, governmental bodies pursuing the criminal matters may argue that witness testimony and evidence may be compromised due to the differing procedural standards in civil and criminal proceedings.  These cases are of little relevance to the issue before this Court.  The issue here is whether an individual who voluntarily seeks bankruptcy relief can prevent the trustee from fulfilling his duty under 11 U.S.C. §704 to pursue avoidance actions and collect assets for distribution to creditors.  In this case, the Debtor has

come forward with no case law which supports his request that this adversary be stayed because of the possibility that he might assert his Fifth Amendment rights at some future time.

There are few bankruptcy court cases where a debtor obtains a stay of discovery in bankruptcy litigation during the pendency of a criminal investigation.  Although bankruptcy courts have the equitable and statutory power to stay litigation under 11 U.S.C. §105, they are hesitant to do so.  *See, Hale, et al. v. Carlson (In re Hale)*, 980 F. 2d 1176, 1179 (8th Cir. 1992); *Carroll, et al. v. Unicom AP Chemical Corp., et al*. *(In re MGL Corporation),* 262 B.R. 324, 328 (Bankr. E.D. Pa. 2001) (stay denied as it would impede trustee's ability to recover assets for unsecured creditors); *accord, Kozyak v. Poindexter, et al.  (In re Financial Federated Title & Trust, Inc.),* 252 B.R. 834, 839 (Bankr. S.D. Fla. 2000*); see also, Amsave Credit Corporation v. Marceca (In re Marceca*), 131 B.R. 774, 778 (Bankr. S.D.N.Y. 1991) ("stay of pending civil action until the outcome of related criminal proceeding is an extraordinary remedy").

There is a critical difference between a defendant who seeks a stay of discovery in non-bankruptcy civil cases and the Debtor here who seeks a stay of the trustee's avoidance action. The defendants in the non-bankruptcy cases cited in the Debtor's Memorandum were sued in civil proceedings and were compelled to testify and produce documents under the applicable rules of civil procedure, which offer less protection than the rules of criminal procedure in the parallel criminal investigation.  The Debtor here, like the debtors in the *Hale* and *Marceca* cases, **voluntarily** filed for bankruptcy, seeking the protection of the automatic stay and the equitable relief of discharge of debt.

Section §704(a) of the Bankruptcy Code requires the Trustee to collect and reduce to money property of the estate, and to close the estate as expeditiously as is compatible with the best interests of all parties to investigate the financial affairs of the debtors, and, if advisable, to

oppose the discharge of the debtor.  11 U.S.C. §704(a)(1), (4), and (6).  The Debtor claims that the Trustee "faces no particular injury from delay" from "dissipation of assets or an attempt to gain an unfair advantage."  Debtor's Memorandum at 13.  A stay of this adversary proceeding would prohibit the Trustee from avoiding third-party claims against a valuable asset which should be liquidated for the benefit of creditors.  Delay increases the carrying cost of the Real Estate, which the Bankruptcy Estate must bear, even though the Debtor has no pecuniary interest in the Real Estate.  It is critical that the Trustee pursue avoidance actions as quickly as possible to maximize the value of recoveries for creditors.  *See, Carroll, et al. v. Unicom AP Chemical Corp. et al. (In re MGL Corporation),* 262 B.R. 324, 328 (Bankr. E.D. Pa. 2001) (stay would hinder trustee's expeditious prosecution of claims and would hinder recovery for unsecured creditors); *accord, Kozyak v. Poindexter, et al.(In re Financial Federated Title & Trust, Inc.),* 252 B.R. 834, 839 (Bankr. S.D. Fla. 2000*).*

Counsel for the Debtor cites only one case where a debtor obtained a stay of civil litigation during the pendency of a criminal investigation, *Amsave Credit Corporation v. Marceca (In re Marceca*), 131 B.R. 774 (Bankr. S.D.N.Y. 1991).  In the *Marceca* case, on the last day to file objections to discharge, a creditor filed an adversary complaint objecting to discharge and dischargeability under 11 U.S.C. §§523 and 727(a)(2) .  The court determined that the adversary complaint failed to plead fraud and concealment with sufficient particularity.  The creditor sought leave to amend the complaint.  The debtor sought a stay of the adversary proceeding during the pendency of a criminal investigation based on the same facts, to protect his constitutional privilege against self-incrimination.  While noting that "there is no constitutional mandate for a stay of civil proceedings", the *Marceca* Court ordered a stay of the civil litigation until the earlier of the conclusion of the U.S. Attorney's investigation or an

11

indictment, or four months time.  *Id.* at 778.  The *Marceca* court determined that a stay for a maximum of four months would not prejudice the creditor, as the creditor would be allowed to amend its complaint to cure its defective complaint, while obviating the debtor's immediate need to choose between asserting his Fifth Amendment privilege and putting on a full defense in the adversary proceeding.  *Id.*

The Debtor's assertion that the interest of the Court and public will be advanced by a stay of the litigation is nonsensical.  Sections 521 and 704 of the Bankruptcy Code set forth, with specificity, the duties of the Debtor and of the Trustee, so as to serve the interests of the Court and the public.  As the Court stated in the *Lederman* case, "distribution and discharge are at the heart of the bankruptcy process, and a debtor cannot enjoy the benefits of the process while avoiding its burdens."  *In re Lederman*, 140 B.R. at 53.  The granting of a stay of this avoidance action would contravene the interests of the creditors and the public as established by these statutes.

## CONCLUSION

For the reasons stated above, Randall L. Seaver, Trustee, respectfully requests that the Court deny the Debtor's Motion for Stay of this Adversary Proceeding.

**LEONARD, O'BRIEN
SPENCER, GALE & SAYRE, LTD.**

/e/ Matthew R. Burton

By_____
    Matthew R. Burton, #210018
    Attorneys for Randall L. Seaver, Trustee
    100 South Fifth Street, Suite 2500
    Minneapolis, Minnesota  55402-1234
    (612) 332-1030

Dated: October 16, 2009

410704

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

_____

In re:                                                                        BKY No.:  09-50779

Dennis E. Hecker,                                                              Chapter 7

              Debtor.

_____
                                                                              Adv. Case No.:  09-5042

Randall L. Seaver, Trustee,

              Plaintiff,

vs.                                                              **AFFIDAVIT OF MATTHEW R. BURTON**

Jacob Holdings of Ventanas LLC,
Jacob Properties of Minnesota LLC,
Wells Fargo Bank, Cornerstone Bank,
and Chrysler Financial Services Americas, LLC,

              Defendants.

_____

STATE OF MINNESOTA      )
                      ) ss.
COUNTY OF HENNEPIN    )

      Your Affiant, being first duly sworn, deposes and states as follows:

      1.        I am counsel for Randall L. Seaver, the Chapter 7 Trustee herein.

      2.        Attached hereto as Exhibit A is a true and correct copy of the transcript of the 341

Meeting of Creditors on July 15, 2009 in the case, Dennis E. Hecker, BKY No. 09-50779.

      **FURTHER YOUR AFFIANT SAYETH NOT.**

                                  /e/  Matthew R. Burton

Dated:  October 16, 2009         _____

                                    Matthew R. Burton

410860

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MINNESOTA

---------------------------------------------------------

In re:                              Case No. 09-50779

DENNIS E. HECKER,

                    Debtor.

---------------------------------------------------------

          341 Meeting of Creditors held in the

above-entitled matter on the 15th day of July, 2009,

at ten o'clock in the morning, before Julie A. Rixe,

court reporter and notary public,  at the United

States Courthouse, Room 1017, 300 South Fourth Street,

Minneapolis, Minnesota.

*     *     *

**EXHIBIT A**

## Page 2

```
 1   APPEARANCES:
 2        RANDALL L. SEAVER, Trustee,
 3   12400 Portland Avenue South, Suite 132,
 4   Burnsville, Minnesota  55337, appeared as
 5   Trustee.
 6        CLINTON E. CUTLER, Attorney at Law,
 7   Fredrikson & Byron, P.A., 200 South Sixth Street,
 8   Suite 4000, Minneapolis, Minnesota  55402-1425,
 9   appeared for and on behalf of the Debtor.
10        WILLIAM F. MOHRMAN, Attorney at Law,
11   Mohrman & Kaardal, P.A., 4100 Multifoods Tower,
12   33 South Sixth Street, Minneapolis, Minnesota
13   55402, appeared for and on behalf of the Debtor.
14
15
16
17
18
19
20
21
22        WHEREUPON, the following proceedings
23   were duly had and entered of record, to wit:
24
25
```

## Page 3

```
 1           I N D E X
 2   WITNESS                    PAGE
 3   DENNIS E. HECKER
        Examination by the Trustee      4, 123, 133
 4      Examination by Mr. Clifton          94
        Examination by Mr. Cutler          130
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1        THE TRUSTEE:  Good morning, folks.  My
 2   name is Randy Seaver.  I'm the Chapter 7 panel
 3   trustee appointed by the United States Department
 4   of Justice to administer the Denny Hecker
 5   bankruptcy case.
 6        This questioning is tape-recorded, and
 7   the recording goes next door to the Office of the
 8   U.S. Trustee.  Anyone can get a copy, I believe,
 9   from the Office of the U.S. Trustee.  There's
10   some small cost.
11        And I'm also having it -- a court
12   reporter taking down the testimony, and her name
13   is Julie Rixe and you can get a card from her.
14   She'll transcribe it and you can buy a copy from
15   her, which would be more expensive than just
16   getting the disc.  But those are options for
17   getting this.
18        Would you raise your right hand,
19   please, Mr. Hecker.
20        DENNIS E. HECKER,
21   after having been first duly sworn, was
22   examined and testified on his oath as follows:
23           EXAMINATION
24   BY THE TRUSTEE:
25   Q   And state your name for the record, please.
```

## Page 5

```
 1   A   Dennis Hecker.
 2   Q   And where do you live, Mr. Hecker?
 3   A   17600 Cross Avenue, Cross Lake, Minnesota.
 4        THE TRUSTEE:  Here, I'm going to
 5   circulate a signature sheet, too, and I'd
 6   appreciate it if folks would sign in and give me
 7   a phone number.
 8        And, also, before I start this
 9   questioning, you'll see my contact information on
10   that sheet that's going around.  If anybody has
11   any information they believe would be of
12   assistance to me in administering this case,
13   please feel free to contact me using any of that
14   contact information.
15   BY THE TRUSTEE:
16   Q   Mr. Hecker, how long have you lived at the Cross
17       Lake address that you just gave?
18   A   Approximately 45 days.
19   Q   Which would be what day; what day did you move in
20       there?
21   A   I've owned it for three years.  I don't recall
22       exactly which day.
23   Q   Well, you filed on June 4, just to give you some
24       perspective.  Did you move in before that or
25       after that?
```

Page 6

1  A  I believe, to the best of my knowledge, before,
2     shortly after.
3  Q  A couple of days before?
4  A  I don't really remember.
5        THE TRUSTEE:  Okay.  Say, let me also
6     state this.  Since this case has been filed, my
7     attorneys, who are representing me in this case,
8     and I have had almost daily conversations or
9     communications through e-mail or telephone with
10    Mr. Hecker's attorney, Mr. Cutler's office.  I've
11    requested various information and we have
12    received substantial information through
13    Mr. Cutler's office.  So a lot of the information
14    has been exchanged prior to this meeting today.
15       And I have reviewed the driver's
16    license, Social Security proof from Mr. Hecker
17    and they're appropriate.
18 BY THE TRUSTEE:
19 Q  Mr. Hecker, have you read the bankruptcy
20    information sheet provided by the U.S. Trustee?
21 A  Yes, I have.
22 Q  Did you sign the petitions, schedules, statements
23    and related documents that you filed with the
24    Court and is the signature on those yours?
25 A  Yes.

Page 7

1  Q  Did you read those documents before you signed
2     them?
3  A  Yes.
4  Q  Are you personally familiar with the information
5     contained in those documents?
6  A  Yes.
7  Q  To the best of your knowledge, is that
8     information true and correct?
9  A  Yes.
10       MR. CUTLER:  Mr. Trustee, there are
11    some corrections and additions.  And we'll
12    probably file amendments on this, but we have --
13    as I disclosed to you this morning, we have
14    discovered some additional bank accounts and have
15    given you the bank account forms, the most recent
16    statements for those.
17       In connection with the turnover of the
18    jewelry and the watches yesterday, there was some
19    additional watches that were discovered by
20    Mr. Hecker and have been turned over.
21       And then there's an error on Schedule C
22    with respect to the homestead exemption, and
23    we'll amend that.  It has a zero dollar amount
24    listed and it should be listed up to $300,000.
25       THE TRUSTEE:  Okay.

Page 8

1        MR. CUTLER:  Those are the only
2     transfers or the only -- Oh, there was one
3     additional change.  The Schedule B reflects a
4     tractor, a lawn tractor that was taken off of an
5     insurance schedule.  There's actually a different
6     tractor and that's been, I think, disclosed to
7     Mr. Radde, and he should be aware of the actual
8     tractor that they have.
9  BY TRUSTEE:
10 Q  All right.  Is that a larger tractor than the one
11    that's in the schedules?
12 A  Yes.
13 Q  And there are a lot of attachments for it, too,
14    right?
15 A  Yes.
16 Q  All right.  The things that Mr. Cutler has told
17    me, Mr. Hecker, is everything else in the
18    schedules true and correct, other than what you
19    just said?
20 A  To the best of my knowledge.
21 Q  Okay.  Are there any other errors or omissions to
22    bring to my or the Court's attention?
23 A  Not that I'm aware of.
24 Q  Did you list all of your assets in the schedules,
25    other than what Mr. Cutler just added?

Page 9

1  A  Yes.
2  Q  Did you list all of your creditors in the
3     schedules?
4  A  To the best of my knowledge.
5  Q  Have you ever filed bankruptcy before?
6  A  No.
7  Q  Do you have a domestic support obligation?
8  A  Yes.
9  Q  You pay spousal support?
10 A  Yes.
11 Q  To whom?
12 A  Sandra Hecker.
13 Q  And that's in the schedules?
14 A  Yes.
15 Q  Are you currently employed, Mr. Hecker?
16 A  No.
17 Q  During the 90 days prior to your bankruptcy
18    filing, did you lose any money by execution on a
19    judgment or through a garnishment or otherwise?
20 A  To the best of my knowledge, I'm not sure.
21 Q  It would be in the schedules or the Statement of
22    Financial Affairs if you did; is that right?
23       MR. CUTLER:  Yes, it would be.
24 BY THE TRUSTEE:
25 Q  Okay.  Is that true, Mr. Hecker?

Page 10

1   A   Yes.
2   Q   All right.  Did you voluntarily pay over $5,000
3       to any single unsecured creditor in the 90 days
4       prior to filing?
5           MR. CUTLER:  Yes.
6           THE DEBTOR:  Yes.
7   BY THE TRUSTEE:
8   Q   And are all of those transfers disclosed in your
9       Statement of Financial Affairs?
10  A   To the best of my knowledge.
11  Q   Did you transfer any property or interest in
12      property to anyone in the two years before you
13      filed bankruptcy?
14          MR. CUTLER:  Well, as reflected in the
15      Statement of Financial Affairs?
16          THE TRUSTEE:  Let me rephrase.
17          MR. CUTLER:  Anything other than what's
18      reflected in the Statement of Financial Affairs,
19      Mr. Hecker?
20          THE DEBTOR:  Not that I'm aware of.
21  BY THE TRUSTEE:
22  Q   So any transfers that you made in the two years
23      prior to filing are disclosed in the Statement of
24      Financial Affairs?
25  A   To the best of my knowledge, yes.

Page 11

1   Q   Okay.  Are you self-employed or engaged in any
2       business ventures?
3   A   I started a new venture called New Dimension
4       Consultants.
5   Q   Which is what?
6   A   A consultant for automobile dealers.
7   Q   Did you start that before you filed bankruptcy?
8   A   No, I didn't.
9   Q   Just describe generally for the record what your
10      business was at the time you filed bankruptcy.
11          MR. MOHRMAN:  Which business are you
12      referring to?
13          THE TRUSTEE:  Anything he was engaged
14      in.
15          And who are you, sir?
16          MR. MOHRMAN:  My name is William
17      Mohrman.
18          THE TRUSTEE:  And you're an attorney
19      representing Mr. Hecker?
20          MR. MOHRMAN:  I am.
21  BY THE TRUSTEE:
22  Q   All right.  I just want a general description on
23      the record of what business you personally were
24      engaged in, Mr. Hecker, when you filed
25      bankruptcy.

Page 12

1   A   I was in the automobile business and
2       automobile-related services and had some other
3       business interests in other kinds of businesses.
4   Q   Fair to say that it was a fairly complex business
5       that you were involved in?
6   A   Yes.
7   Q   Okay.  And in the schedules and Statement of
8       Financial Affairs, there's at least some
9       indication of these businesses, correct?
10  A   Yes.
11  Q   Okay.  Mr. Hecker, you have turned over some
12      jewelry in response to my demand, correct?
13  A   Yes.
14  Q   And I understand that there was some additional
15      items that were turned over.  By additional I
16      mean in addition to what you actually had listed
17      in your schedules.  Is that correct?
18  A   Yes.
19  Q   Let me just give you a copy of this complaint.
20      This is the complaint that I filed earlier this
21      week seeking turn-over of jewelry.  And if you
22      look at the Exhibits A and B here, Mr. Hecker,
23      Exhibit A is what was in your schedules.
24      Exhibit B came from the insurance policies.  And
25      I'd like you to look at Exhibit B and tell me --

Page 13

1       There are two pages to Exhibit B.  Tell me if
2       there are any items on there that were not turned
3       over yesterday.
4   A   The first item is a Gents nugget ring.  I have no
5       idea where that is.
6   Q   Okay.
7   A   The schedule should reflect that it's maybe three
8       to five years old.
9           MR. CUTLER:  You're referring to the
10      insurance schedule?
11          THE DEBTOR:  Yes.
12          MR. CUTLER:  Exhibit B?
13          THE DEBTOR:  Yes.  And the link
14      bracelet, I have no idea.
15  BY MR. SEAVER:
16  Q   When you say you have no idea, do you think you
17      lost it, do you think it was stolen?  I mean,
18      what do you think about these things?
19  A   The first one might have been my father's ring
20      when he died.  I don't recall.  I don't recall
21      the ring.
22  Q   Okay.
23  A   The bracelet, I don't recall the bracelet.  It
24      may be on there as Gents.  I'm not sure that my
25      wife didn't have it or where it went.  I don't

Page 14

```
 1      know.
 2  Q   Okay.  So those two items you don't know their
 3      whereabouts?
 4  A   Correct.
 5  Q   All right.
 6          MR. CUTLER:  Mr. Seaver, could I ask a
 7      question?
 8          THE TRUSTEE:  Sure.
 9          MR. CUTLER:  Mr. Hecker, what efforts
10      have you made to locate jewelry?
11          THE DEBTOR:  I exhausted, to the best
12      of my knowledge, every potential place I think it
13      would be.
14  BY THE TRUSTEE:
15  Q   Which is where?
16  A   Well, I've looked in -- I found items that were
17      missing when I was moving some of my personal
18      things to Cross Lake that were -- I didn't really
19      use a lot of safes, so I had it -- And those
20      items were the most expensive, I didn't wear, so
21      they were in some clothes.
22  Q   Okay.  So continuing on with this Exhibit B to
23      the complaint, are there any other items here, on
24      Exhibit B, that you have not been able to locate?
25  A   I don't believe so.
```

Page 15

```
 1  Q   Okay.  And did you locate -- when you looked
 2      further, did you locate any additional watches or
 3      jewelry items by --
 4  A   I believe there were some items we turned in
 5      yesterday that weren't on the schedule.
 6  Q   That weren't on the schedule and weren't on this
 7      insurance schedule --
 8  A   That's right.
 9  Q   -- either?  Okay.
10          Mr. Hecker, at the Cross Lake home
11      there is -- there are a number of boat lifts and
12      docks, dock and sections.  Are those your
13      property?
14  A   Part of the property, yes.
15  Q   What do you mean by that?
16  A   In the records it shows that there's three
17      separate addresses there.
18  Q   Okay.
19  A   And each address has its own dock.
20  Q   Okay.  So what ones are yours?
21  A   When you say yours, mine personally or --
22  Q   I mean Denny Hecker personally, yes.
23  A   The one where my residence is.
24  Q   In front of the large structure there --
25  A   Yes.
```

Page 16

```
 1  Q   -- there's a dock system and how many boat lifts?
 2  A   There was four jetski lifts and two boat spots.
 3  Q   Okay.  And those are all property of Dennis
 4      Hecker?
 5  A   The two boats are -- Are you talking about the
 6      docks?
 7  Q   I'm not talking about the boats yet.  I'm talking
 8      about the docks, boat lifts, canopies.
 9  A   I believe they're part of the homestead.
10  Q   Are they property of Dennis Hecker?
11          MR. CUTLER:  Do you own them as opposed
12      to one of your companies?
13          (Discussion held off the record between
14          the debtor and his attorney.)
15          THE DEBTOR:  Yes.
16  BY THE TRUSTEE:
17  Q   You own them?
18  A   Yes.
19  Q   Dennis Hecker owns them?
20  A   Yes.
21  Q   All right.  Then there are two other guest houses
22      there --
23  A   Yes.
24  Q   -- correct?  And those guest houses, each have
25      docks in front of them?
```

Page 17

```
 1  A   Yes, they do.
 2  Q   And they have boat lifts also?
 3  A   One of them doesn't.
 4  Q   Okay.  The two dock systems for those guest
 5      houses, who owns those?
 6  A   The LLC that owns the property.
 7  Q   Okay.  Did the LLC purchase those docks?
 8  A   To the best of my knowledge.
 9  Q   And the LLC purchased the boat lift too?
10  A   I believe so.
11  Q   Okay.  Where would those items have been
12      purchased?
13  A   The docks?
14  Q   Yes.
15  A   I have no idea.
16  Q   Would --
17  A   The docks at the main home are five years old or
18      six years old.  I wouldn't recall.  The other
19      ones are wooden docks.  I'm not sure where they
20      came from.
21  Q   All right.  How many watch winders do you have?
22  A   To the best of my ability, one.
23  Q   Okay.  And where is that located, sir?
24  A   It's in 1492 Medina.
25  Q   Okay.  How much did you pay for that when you
```

## Page 18

1    bought it?
2    A   I have no idea.
3    Q   Over $10,000?
4    A   I have no idea.
5    Q   Okay.  In Medina, at the North Bridge Drive
6    address, who resides there?
7    A   Christi Rowan.
8    Q   And what's your relationship with Ms. Rowan?
9    A   We have a personal relationship.
10   Q   How long have you had that personal relationship?
11   A   On and off approximately a year.
12   Q   About a year, you think?
13   A   Yes.
14   Q   So June of 2008, roughly?
15   A   Approximately.
16   Q   Okay.  Is she employed?
17   A   She has her own photography business.
18   Q   Do you know how much money she makes at that
19   business?
20   A   I have no idea.
21   Q   Okay.  Have you ever deposited any money into any
22   bank accounts held in her name?
23   A   I haven't personally deposited any money into her
24   bank accounts.
25   Q   Have you given any money to anyone to deposit

## Page 19

1    into her account?
2    A   I've given her some money, yes.
3    Q   Okay.  And that's all disclosed in the Statement
4    of Financial Affairs?
5    A   I believe so.
6    Q   All right.  The furniture that's in that home,
7    where did it come from?  In that home, now, I'm
8    still talking about Northridge Drive.
9    A   A good share of it is hers and a good share of it
10   came from Scottsdale.
11   Q   Okay.  So some of it there is Denny Hecker
12   property?
13   A   Denny Hecker property and some of it is hers.
14   Q   Okay.  Where did the furniture that came from
15   Scottsdale -- I understand it came from
16   Scottsdale, but where was it before it came to
17   Northridge?
18   A   It was a house that we had that we sold a couple
19   of years ago.
20   Q   Okay.  Was it the house sold in 2008 or was it
21   before that?
22   A   I'm not sure.
23   Q   Okay.  And so it's your testimony that some of
24   the furniture in there came from Scottsdale and
25   then some she moved in?

## Page 20

1    A   Yes.
2    Q   Do you have any idea on percentages how much
3    would be Denny Hecker and how much would --
4    A   I don't recall.
5    Q   Okay.  The values -- I'm looking at your
6    schedules now.  And the values for the real
7    property in Cross Lake, how did you come to the
8    conclusion that those were the appropriate
9    values; did someone give you an opinion?
10   A   Yes, they did.
11   Q   And who was that?
12   A   A real estate company in Cross Lake.
13   Q   Is that Bruce Larson's company?
14   A   Yes.
15   Q   And did they give you a written opinion?
16   A   Yes, they did.
17        THE TRUSTEE:  All right.  Mr. Cutler,
18   could you give me send me a copy of that?
19        MR. CUTLER:  I have it.
20        THE TRUSTEE:  Oh, okay, great.
21        MR. CUTLER:  I'll give it to you right
22   now.
23   BY THE TRUSTEE:
24   Q   Say, back on Christi Rowan, what's the name of
25   her photography business?

## Page 21

1        MR. CUTLER:  The record should reflect
2    that I've given the Trustee an original letter
3    from Bruce Larson concerning the value of the
4    Cross Lake property.
5        THE TRUSTEE:  Well, it's actually
6    Robert Berklund.  I think he's an associate of
7    Mr. Larson.  Larson Group Real Estate is the
8    place.
9    BY THE TRUSTEE:
10   Q   But back to Ms. Rowan, what's the name of her
11   photography business?
12   A   I don't know the exact name.  It might be Rowan
13   Photography.  I'm not sure.
14   Q   Okay.  Are there lease payments being made on the
15   Northridge property?
16   A   The lease payments, they spent a great deal of
17   capital improving the property.
18   Q   Who's they?
19   A   Rowan.
20   Q   Okay.
21   A   And the first actual payment starts August 1st.
22   Q   So Ms. Rowan made improvements to the real
23   property?
24   A   Yes, she did.
25   Q   What value, how much in a dollar value?

Page 22

1  A   I believe in the 25,000 range.
2  Q   Okay.
3  A   The house had sat vacant for two years.
4  Q   All right. So no lease payments are being made
5      at this time; is that right?
6  A   Well, in consideration of the lease payments,
7      they did the improvements.
8  Q   So no lease payments are -- no actual money is
9      changing hands right now; is that right?
10 A   The first cash transaction will be August 1st.
11 Q   Okay. I'm back on the schedules now and I'm
12     looking at Schedule B for the personal property.
13     And cash on hand says $5,500, correct?
14 A   Yes.
15 Q   Is that all the cash that you had on hand when
16     you filed bankruptcy?
17 A   Yes, it was.
18 Q   There was a search warrant executed on your home
19     on Cross Lake and in Medina, correct?
20 A   Yes, there was.
21 Q   Was any cash seized in connection with the
22     execution of those warrants?
23 A   My wife and I had 17,000 in the safe at Cross
24     Lake.
25 Q   Okay. 17,000?

Page 23

1  A   Yes. 5,500 was my money, the balance was hers.
2  Q   Where would she have gotten her money?
3  A   She would have gotten her money from me over a
4      period of time.
5  Q   Yeah. When was the last time she was employed?
6  A   In 16 years, never.
7  Q   Okay. So the whole 17,000 originally came from
8      Denny Hecker?
9  A   Yes.
10 Q   And is the State of Minnesota still holding that
11     money?
12 A   Yes, they are.
13 Q   All right. Was any money seized in Medina?
14 A   No.
15 Q   Did they look in the safe there?
16 A   They spent hours looking in the safe.
17 Q   Did they take anything out of the safe that you
18     know of?
19 A   There were a couple of Minnesota Viking watches.
20 Q   Okay.
21 A   After seven hours of drilling the safe.
22 Q   Is that all that you think was in the safe, was
23     two Minnesota Viking watches?
24 A   That's all the -- I didn't have any money. I
25     didn't have anything. I was surprised they were

Page 24

1      there.
2  Q   Okay.
3          MR. CUTLER: And, Mr. Hecker, the safe
4      was drilled by the State; is that correct?
5          THE DEBTOR: Yes.
6          MR. CUTLER: And that's because you
7      didn't have a key to --
8          THE DEBTOR: I didn't even know the
9      combination.
10 BY THE TRUSTEE:
11 Q   Okay. Back to Schedule B, the bank balances,
12     there are a large number of banks here. And as
13     Mr. Cutler indicated, he disclosed to me before
14     this meeting started and then on the record here
15     that there were I think a couple of accounts that
16     you had overlooked. How did you determine the
17     balances in each of these bank accounts when you
18     had Schedule B prepared?
19 A   I've had an assistant that handles all my
20     personal affairs for the last 15 years. They
21     prepared that with the statements they received
22     from the banks.
23 Q   And who was that assistant?
24 A   Susan Miller.
25 Q   What's Susan Miller's address?

Page 25

1  A   I don't know. She lives in Elk River.
2  Q   Okay. Is she employed by one of the Hecker
3      companies?
4  A   She just resigned a week ago.
5  Q   I'm sorry. She resigned --
6  A   Just resigned a week ago.
7  Q   Okay. So is it accurate to say she provided the
8      information to your attorneys to put in here?
9  A   She provided the information for me and she
10     overlooked a couple of accounts.
11 Q   Okay. Did you verify any of that information
12     before you signed the schedules? I mean, by that
13     I mean --
14 A   To the best of my knowledge, the information we
15     gave you when we did the schedules was all there
16     was.
17 Q   Did you personally look at any of the bank
18     account statements to verify the amounts?
19 A   Susan prepared a spreadsheet with all the bank
20     balances from January through the date I filed.
21 Q   All right.
22 A   I was surprised today when Clint had whatever
23     there was.
24         THE TRUSTEE: Mr. Cutler, would you
25     send me a copy of that spreadsheet, please?

Page 26

```
 1          MR. CUTLER: Yes.
 2       THE TRUSTEE: Is that a problem?
 3          MR. CUTLER: No, it's not a problem.
 4       THE TRUSTEE: Great, okay.
 5          THE TRUSTEE: And I received today from
 6    Mr. Cutler just before this meeting started, I
 7    received copies of bank account statements
 8    because, of course, you have to provide me with
 9    copies of statements that cover the date of
10    filing. I haven't had the chance to review these
11    to see if all of the statements are here for
12    covering June 4.
13          Did you look at that, Mr. Cutler; are
14    there some missing?
15          MR. CUTLER: Well, I relied on my
16    staff.
17       THE TRUSTEE: Okay.
18          MR. CUTLER: But we believe it covers
19    the period of the date of the filing.
20       THE TRUSTEE: For all of the accounts?
21          MR. CUTLER: Yes.
22    BY THE TRUSTEE:
23    Q   Okay. Mr. Hecker, in looking at the TCF account,
24    I just have a couple questions for you about a
25    few things that I see going out of there.
```

Page 27

```
 1          MR. MOHRMAN: Is this on the
 2    schedules?
 3    BY THE TRUSTEE:
 4    Q   I don't know if it is or not. Here's the TCF
 5    bank statement and it's dated 6/10, you see, up
 6    here (indicating). And down here (indicating),
 7    on 5/19 and 5/14 I see two checks, seventy-three
 8    -- 5173 and 5174, each for $2,500 going out. Do
 9    you know what those were?
10    A   I have no idea.
11    Q   Okay. Mr. Hecker, how are you so sure that you
12    had exactly $5,500 in cash on the day of filing?
13    A   At the filing Clint asked me how much money I
14    had, and I shared with you at our first meeting
15    it was 5,500.
16    Q   No. I understand that's what you told Mr. Cutler
17    and you told me that too. I'm asking you, how
18    are you sure that it was 5,500? Did you count it
19    out?
20    A   Yes, I did.
21    Q   Okay. Where were you when you did that?
22    A   To the best of my knowledge, my office.
23    Q   Here in the Cities?
24    A   Yes.
25    Q   All right. And then you took that 5,500, and
```

Page 28

```
 1    what did you do with the 5,500 after that?
 2    A   We went to Cross Lake. And we had met with you
 3    and you had asked to -- whether it be turned over
 4    with the jewelry and the other things, so I put
 5    it in the safe in Cross Lake.
 6    Q   Did you spend any cash between the time that your
 7    bankruptcy was filed and the time that the search
 8    warrant was executed?
 9    A   I don't understand the question.
10    Q   Between June 1st and the day the search warrant
11    was executed, did you spend any cash anywhere?
12    A   I believe the search warrant was executed on
13    June 15th or 14th.
14    Q   Okay.
15    A   So I filed on June 4th.
16    Q   Yep. Between those dates, the 4t and whatever
17    day the search warrant was executed, did you
18    spend any cash anywhere?
19    A   I don't believe any significant amount.
20    Q   What does that -- What does significant mean to
21    you?
22    A   Well, one, I don't recall, but I don't believe --
23    If there was any money spent, it was money that I
24    got from my wife or... I'd say it was less than a
25    couple thousand dollars.
```

Page 29

```
 1    Q   Okay. So between those dates it would have been
 2    -- you think you spent less than a couple
 3    thousand dollars in cash?
 4    A   Yes.
 5    Q   And the source of that cash would have been from
 6    Tamitha?
 7    A   Yes.
 8    Q   Okay. Have you received any cash from any
 9    sources other than Tamitha since you filed your
10    bankruptcy?
11    A   Are you saying cash or --
12    Q   I'm saying cash right now.
13    A   Would a loan be cash?
14    Q   Well, I was going to ask you about loans too.
15    Let's stick to cash for a minute, though. Have
16    you received currency?
17    A   Since the filing?
18    Q   Yes.
19    A   Not to my knowledge.
20    Q   Have you received loans since the filing?
21    A   Yes, I have.
22    Q   From who?
23    A   Steve McDaniels.
24    Q   Okay. And how much was it, sir?
25    A   A hundred thousand. Actually, it was received by
```

---

Page 30

1    the new business.
2  Q   So there would be a $100,000 check going
3     into an --
4  A   That's correct.
5  Q   -- account -- going into an account for the new
6     business?
7  A   Yes.
8  Q   Okay.  So since the filing, that's your only
9     source of moneys, is that $100,000 loan?
10 A   I believe so, yes.
11 Q   Okay.  Back to the schedules, Mr. Hecker, at
12    Item 21 it lists GELCO Corporation Sales
13    Agreement.  What is that?  And I'm just looking
14    for a brief description here.
15 A   It's an earn out on a business I sold to GE.
16 Q   Okay.  And is that payable to you personally,
17    Dennis Hecker personally?
18 A   It's payable to one of three different entities.
19 Q   Which would be?
20        MR. CUTLER:  Do you recall?
21        THE DEBTOR:  I don't recall, but I
22    think it's disclosed.
23        MR. CUTLER:  There's a written
24    contract --
25        THE DEBTOR:  Yes.

---

Page 31

1        MR. CUTLER:  -- that lists the
2     entities?
3        THE DEBTOR:  That's correct.
4  BY THE TRUSTEE:
5  Q   Yeah.  I'm just trying to determine, is one of
6     those three Dennis Hecker personally?
7  A   I don't want to sound like I'm naive.  It could
8     be, but I'm not sure.
9  Q   Okay.  What are the causes -- And I'm still at
10    Item 21 in Schedule B -- the causes of action
11    against the shareholders and directors of
12    HogRider Investments.  Again, I'm just looking
13    for a brief summary here.
14 A   I invested four million with the company and I
15    was to be a director, shareholder.  And over the
16    period of time, I was never invited to a meeting
17    or advised of the shareholder actions or the
18    board actions.
19        And when the businesses started to
20    fail, we borrowed a million dollars from them.
21    I'm not sure which company or how it all lined
22    up, but part of that was we had to give them a
23    get-out-of-jail release for all the things that
24    they didn't do with me as a shareholder,
25    director.  And I don't believe -- we think -- I

---

Page 32

1     believe that we have a claim.
2  Q   Okay.
3  A   Right now they have the stock secured for a
4     million dollars and I paid four million for it.
5  Q   Is that the JC Bromac --
6  A   Yes.
7  Q   -- Corporation?  That's what that is?
8  A   Yes.
9  Q   Okay.  And I have documents that Mr. Cutler, I
10    believe, has provided to me indicating that there
11    was a loan.  It says that it's loaning it to
12    Dennis E. Hecker in October of 2008, a million
13    dollars.  Is that what you were talking about?
14 A   I believe so, yes.
15 Q   All right.  And what happened to that million
16    dollars; where was it deposited, is what I'm
17    asking?
18 A   That million dollars ended up into the
19    businesses.
20 Q   Okay.  Did it go through one of your personal
21    accounts before it got to the businesses?
22 A   I'm not sure.
23 Q   Okay.  When I looked at these documents, it
24    looked to me like there had been -- at some point
25    a dispute arose between Cornerstone Bank and

---

Page 33

1     JC Bromac.  Is that right?
2  A   I believe so.
3  Q   Do you remember that?  Tell me what you do
4     remember about it.
5  A   To the best of my knowledge, we borrowed the
6     money from Cornerstone Bank to pay a portion of
7     the HogRider investment.  And I believe that
8     there were some concerns of who had a filing on
9     the stock.
10 Q   Okay.  So the three million from Cornerstone was
11    for the same -- an investment in this -- the
12    HogRider entity?
13 A   There was a company that borrowed the money from
14    Cornerstone.
15 Q   Okay.
16 A   And I'm not certain that the stock was pledged as
17    collateral.
18 Q   Okay.  So a company borrowed the money.  Did
19    Denny Hecker personally guarantee it?
20 A   Yes, he did.
21 Q   Okay.  When was the money borrowed from
22    Cornerstone?  Let me try and narrow the frame a
23    little bit.  Was it in late 2008 that it was
24    borrowed from Cornerstone?
25 A   It was borrowed when I bought the stock from

---

1    HogRider.
2  Q   Can you put a rough time frame on that?  Was it
3    2008, 2007?
4  A   2007 or '8.
5  Q   Okay.  When you originally borrowed -- When the
6    money was originally borrowed from that bank, did
7    they get security documents then?  By that I mean
8    did they get a security interest in various
9    assets then or did they get it later?
10  A   I don't know.  I just signed the guarantee.
11  Q   Okay.  And then did the money from that loan go
12    right to the company?  Well, let me rephrase it.
13    Did it go into your personal account?
14  A   I'm not sure if it went to the personal account
15    or direct to them.
16  Q   Okay.
17  A   The end result was they got it.
18  Q   They being?
19  A   HogRider.
20  Q   Okay.
21  A   Or, actually, the shareholders.  I'm not sure.
22    It could be HogRider.
23  Q   There are written documents that would show me --
24  A   There's a transaction that has, if I can recall,
25    yes.

1  Q   Okay.  Let me show you a schedule of items, and
2    this is from the AIG policy.  And this relates to
3    a lawn mower and attachments, and I think you
4    talked about this earlier.  Is this the actual
5    lawn mower and attachments that exist now?
6  A   I have no idea.
7  Q   Okay.
8  A   But I believe that --
9  Q   I'll tell you I took that from your AIG policy.
10    You can see the stamping up there.
11  A   I want to explain that the number of businesses I
12    had, I didn't insure or direct or follow-up or
13    understand the magnitude of what it was.  I just
14    told somebody to handle it.  So if this is the
15    tractor, I'm not sure.
16  Q   Sure.
17  A   There's a newer tractor that exists that cost
18    more money.
19  Q   Okay.  And you've told Fred Radde?
20  A   I e-mailed him yesterday.
21  Q   Okay, great.  Is that in Medina?
22  A   It's in Cross Lake.
23  Q   Okay.  We just talked about any money you
24    received since filing.  I just want to make sure
25    we're clear on this.  The only money, cash,

1    checks, wire transfers, any source of funds,
2    loans, that you've received since filing is
3    either money from Tamitha or that $100,000 loan;
4    is that right?
5  A   I believe so.
6  Q   Okay.  Have you -- In the last five years,
7    Mr. Hecker, have you ever transferred money out
8    of this country?
9  A   Never.
10        MR. CUTLER:  Well, wait a minute.
11        THE DEBTOR:  Not that I'm aware of.  I
12    believe never, but not that I'm aware of.
13  BY THE TRUSTEE:
14  Q   Okay.  One of your businesses has a business in
15    Canada, in Ontario, right?
16  A   A fishing lodge, yes.
17  Q   Yeah.  So do you think you might have transferred
18    money into Canada with respect to that?
19  A   I don't want to sound like I don't know, but I
20    had a whole big group of businesses and somebody
21    handled all these investments.
22  Q   Okay.
23  A   Could have.
24        MR. CUTLER:  But I think Mr. Seaver is
25    asking about you personally.

1  BY THE TRUSTEE:
2  Q   Yeah, I am, and I was just going to clarify
3    that.
4  A   Mr. Seaver, the check could have came from me,
5    but I'm not sure if it did or not.
6  Q   Okay.  So let's eliminate Canada from the
7    question for a minute.  You have never
8    transferred more than $5,000 to any bank in any
9    country outside of the United States; is that
10    correct?
11  A   The only transfer we might have is when I
12    acquired the Las Ventanas property.
13  Q   And tell me what that is.
14  A   It's a condo in Mexico.
15  Q   All right.  So there may have been or would have
16    been money going to Mexico for that purpose?
17  A   Mr. Seaver, if it was for the closing or for the
18    title, escrow, there's documents to support all
19    that.
20  Q   Have you ever held a bank account outside of the
21    United States?
22  A   I don't believe so.
23  Q   Have you ever had anyone else take money from the
24    United States on your behalf to deposit into any
25    account --

Page 38

1  A  No.
2  Q  -- outside the United States?
3  A  No.
4  Q  Is there a -- Your schedules -- I'm back at
5      Schedule B.  It lists a Grand piano, a 1985
6      Kawai.  Is there also another Grand piano in one
7      of the homes?
8          MR. MOHRMAN:  What page are you on?
9  BY THE TRUSTEE:
10 Q  I'm on -- It's Item 8 at Schedule B.
11 A  I believe that there is two Grand pianos.  One is
12     scheduled in the personal property of Hunter and
13     one is scheduled in the property of Northridge.
14 Q  Okay.  So I'm looking right now.  I'm looking at
15     Item 8, specifically, of Schedule B and there's
16     one Grand piano there, a 1985 Kawai.  Is that one
17     at -- Is that one at Hunter Ridge (sic)?
18 A  That would be at Northridge.
19 Q  Northridge, okay.  And the other one?
20 A  Hunter Drive.
21 Q  Hunter Drive.  I'm sorry.  I misspoke.  What sort
22     of Grand piano is at Hunter Drive; do you know
23     the model?
24 A  It's seven to ten years old.  I have no idea.
25 Q  How much did you pay for it?

Page 39

1  A  I believe at that time 10,000 or less.
2  Q  Okay.  Have you given away sets of golf clubs to
3      anyone in the last year?
4  A  In our business we did a lot of promotions and
5      give-aways.  We might have gave away a half a
6      dozen sets --
7  Q  Okay.
8  A  -- maybe more.
9  Q  Still at Schedule B, Item 13, the Smith Barney
10     consolidated account, let me tie this in with
11     some other things.  When I went through the
12     transfers that you disclosed in the Statement of
13     Financial Affairs, there are a number of very
14     large transfers to Smith Barney.  I'll just pick
15     one as an example.  I'm looking at what your
16     document says at the top of it is SOFA 3(c).
17     It's First Federal Riverwood, transfers to
18     affiliates and relatives from June 4, 2008 to
19     June 4, 2009.
20         MR. MOHRMAN:  Is this in the
21     schedules?
22         THE TRUSTEE:  Yeah, it is.
23         MR. MOHRMAN:  Where?
24         THE TRUSTEE:  Here, I can show you my
25     copy.  For some reason mine don't have page

Page 40

1      numbers on them.
2  BY THE TRUSTEE:
3  Q  You see there's a million dollar transfer to
4      Smith Barney July of '08, and then on the next
5      page there are other large transfers, 800,000,
6      700,000 and so on.  Why were you making those
7      transfers to Smith Barney?
8  A  They were margin calls on stock that I bought.
9  Q  Okay.  And what stock was that?
10 A  Dollar Rent-A-Car.
11 Q  All right.  What happened to that stock?
12 A  It went from $12 or $13 to 85 cents.
13 Q  Do you still own that stock?
14 A  No, I don't.
15 Q  What happened to it; how did you dispose of it?
16 A  I sold it to Smith Barney.
17 Q  Okay.  Was it part of this whole series of
18     transactions that went to Smith Barney?
19 A  The transactions were with Smith Barney in the
20     acquisition and the sale.
21 Q  Okay.  And when did you sell it to Smith Barney?
22 A  I didn't sell it to them.  They were the
23     stockbroker.
24 Q  Right, I know, but you bought the --
25 A  I believe sometime in -- I bought the week of

Page 41

1      Easter of '08, and I believe sometime in July
2      of '08 I sold it.
3  Q  And you sold it to Smith Barney?
4  A  They were the broker.
5          MR. CUTLER:  They were the broker.
6  BY THE TRUSTEE:
7  Q  Oh, okay.  You just sold it in the market?
8  A  Sold it on the market.
9  Q  Okay, okay.  All right.  Going back to the main
10     part of Schedule B -- And I would see the funds
11     from that coming into one of your bank accounts?
12 A  Yes.
13 Q  Okay.  Going back to Schedule B, there's
14     reference to a membership in Spring Hill Club.
15     I'm at Item 35 of Schedule B.
16 A  Yes.
17 Q  What is Spring Hill Club?
18 A  It's a golf club.
19 Q  Okay.  And what kind of membership do you have
20     there?
21 A  A golfing membership.
22 Q  Okay.  Was there an initiation fee when you
23     joined?
24 A  Originally it was 65,000.
25 Q  Okay.

## Page 42

1　A　And today they lowered new members to, I believe,
2　　　40,000, and there's a waiting list of about three
3　　　years to sell it back to them.
4　Q　There's an agreement that they'll buy back
5　　　memberships, but you have to get put on a waiting
6　　　list; is that the way it goes?
7　A　I'm not positive, but that's what I believe.
8　Q　Okay. Have you tried to do that, to sell that?
9　A　The guy told me that I wouldn't live long enough
10　　　to buy it back.
11　Q　Okay. So you asked about it, but you didn't do
12　　　it back when you learned you wouldn't live long
13　　　enough?
14　　　　　MR. CUTLER: You still own it?
15　　　　　THE DEBTOR: Yeah, I still own it.
16　BY THE TRUSTEE:
17　Q　Yeah, okay. Do you still go out there and use
18　　　it?
19　A　I haven't used it once this year.
20　Q　You haven't used it at all this year?
21　A　No.
22　Q　Okay.
23　A　One more thing.
24　Q　Sure.
25　A　I believe on the golf club membership, when you

## Page 43

1　　　go on the list you still have to pay the dues
2　　　until they buy it back.
3　Q　Okay. How much are the dues?
4　A　Twenty five thousand a year.
5　Q　Where are you on dues payments? By that I mean
6　　　are you current on payments?
7　A　I believe at this time -- You make an annual
8　　　payment, semiannual payment. I believe that at
9　　　this point I'm current until the next payment is
10　　　due.
11　Q　Okay. There was a payment made in the months
12　　　before you filed bankruptcy, right?
13　A　I believe so.
14　Q　Okay. Is there still furniture in a storage
15　　　facility in Scottsdale?
16　A　That's the furniture now located in Medina.
17　Q　Okay. So it all got moved up here?
18　A　Yes.
19　Q　So there's no furniture in storage in Scottsdale?
20　A　No.
21　Q　Okay. At the Statement of Financial Affairs at
22　　　Item 3B, that's the transfers to creditors from
23　　　March 6 of '09 to June 4 of '09, and I'm starting
24　　　at the first page. And, Mr. Hecker, I've just
25　　　turned it to a page that says SOFA 3(b) up at the

## Page 44

1　　　top, and that has some transfers to Toyota Motor
2　　　Credit right up at the top, doesn't it?
3　A　Yes, it does.
4　Q　Okay. Why were those transfers made?
5　A　I believe they were payments that I made on the
6　　　buildings or paid on behalf of the dealership for
7　　　credit lines that they had that they were
8　　　deficient in.
9　Q　All right. These are payments coming out of the
10　　　Denny Hecker personal account, though; am I
11　　　right?
12　A　I believe so, yes.
13　Q　Okay. Mr. Hecker, I have seen some documents
14　　　that would seem to indicate that some shares of
15　　　stock that you owned were turned over to Toyota
16　　　in May of 2009. Does that ring any bells with
17　　　you?
18　A　Shares of stock?
19　Q　Yeah, business interests. Here, let me just show
20　　　you. We -- My attorneys received your corporate
21　　　records or business records for various of your
22　　　entities. And I'm looking at the stock
23　　　register. This is Brainerd Imports, LLC.
24　　　There's a notation here that says, original
25　　　certificate delivered to Toyota Motor Credit

## Page 45

1　　　Corporation 5/7/09, and then it refers to
2　　　99 membership units. And, in fact, in that
3　　　corporate file there's a receipt here from Toyota
4　　　Motor Credit Corporation indicating their receipt
5　　　of those business membership units and one other
6　　　membership unit.
7　A　Is there an attachment to -- Was the request from
8　　　Toyota attached to the -- And you got that from
9　　　our legal counsel?
10　Q　It came through your attorney.
11　　　　　MR. CUTLER: It came from Mr. Parker?
12　BY THE TRUSTEE:
13　Q　It did, yeah. That's my understanding.
14　A　To the best of my knowledge, maybe Toyota Credit
15　　　required that to continue the facility until the
16　　　dealership now has a purchase agreement on.
17　Q　Okay. Do you recall, have any personal knowledge
18　　　of turning those things over to Toyota?
19　A　Mr. Seaver, if somebody put it in front of me, I
20　　　signed it, I'm sure.
21　Q　Okay. You had -- Had you guaranteed the debt to
22　　　Toyota Motor Credit?
23　A　Yes, I did.
24　Q　Okay. What credit cards have you used for your
25　　　personal expenses in the last two years?

Page 46

1  A  I've had American Express, Visa. I'm not sure
2     about a MasterCard.
3  Q  Would it be accurate to say that the primary card
4     you used was that American Express black card?
5  A  Yes.
6  Q  And then there's a US Bank Visa card listed in
7     here. Would that be your other, secondary card?
8  A  I believe so.
9  Q  Do you have any additional credit cards that were
10    not listed in the schedules?
11 A  There may be a gas credit card. I'm not sure.
12 Q  Okay.
13 A  Personally I wouldn't.
14 Q  You aren't using any right now?
15 A  Personal credit cards?
16 Q  Yes.
17 A  I don't have any.
18 Q  Okay. Who is Pat Terhar, T-E-R-H-A-R?
19 A  He's an associate that's worked for us for
20    15 years.
21 Q  Okay. Is he a friend of yours also?
22 A  Most of my employees were friends of mine.
23 Q  Okay. Who's Alex Terhar?
24 A  His 17-year-old son.
25 Q  Okay. Where have you purchased jewelry in the

Page 47

1     last two years?
2  A  I believe from -- The schedule reflects, I think,
3     Molina Jewelers in Scottsdale.
4  Q  I'm sorry, who was that?
5  A  Molina.
6  Q  Molina, M-O-L-I-N-A?
7  A  Yes.
8  Q  Okay.
9  A  And Royal Jewelers in Fargo.
10 Q  All right.
11 A  And I'm not sure of anywhere else.
12 Q  How about Las Vegas, any jewelers there?
13 A  Maybe somewhere on the credit card schedule. I'm
14    not sure.
15 Q  Okay. How about Aspen?
16 A  There may be something on the credit card
17    schedule for Aspen.
18 Q  Yeah. I'm not asking you about what's in the
19    schedules, though. I'm asking where you
20    purchased jewelry in the last --
21 A  I'm answering to the best of my ability.
22 Q  You don't recall any purchases in Aspen?
23 A  I recall Aspen and Las Vegas is probable.
24 Q  Okay. What would be the jewelers in those two
25    places?

Page 48

1  A  I would have to get the names for you.
2  Q  Where would you get the names?
3  A  Look it up in the Yellow Pages.
4  Q  Oh, and you'd see it and recognize it?
5  A  Yes.
6  Q  Would you do that and just get that to
7     Mr. Cutler?
8  A  Yes.
9  Q  Thank you. What's 5H Investments? I just see a
10    payment here to them for an electronic funds
11    transfer back in August of '08, $3,500.
12       MR. MOHRMAN: Where are you looking,
13    sir?
14 BY MR. SEAVER:
15 Q  I am looking on one of the pages of the Statement
16    of Financial Affairs, the very last item on that
17    page. Here, I'll just show you rather than go
18    through there. See, this page just shows
19    5H Investment, $3,500, 8/12 of '08.
20       MR. MOHRMAN: Can I see that again?
21       THE TRUSTEE: Sure. I'm trying to
22    figure out where we are. Thank you.
23       THE DEBTOR: I have no idea.
24 BY THE TRUSTEE:
25 Q  No idea? Okay. Since your bankruptcy filing,

Page 49

1     Mr. Hecker, have you paid your attorneys any
2     money?
3  A  Yes.
4  Q  All right. How much have you paid?
5  A  I believe --
6        MR. CUTLER: Can we have a moment?
7        (Discussion held off the record between
8        the Debtor and his attorney.)
9        THE DEBTOR: Yes.
10 BY THE TRUSTEE:
11 Q  How much have you paid?
12 A  Ten thousand.
13 Q  And that was to who?
14 A  Mr. Mohrman's firm.
15 Q  All right. And where did that money come from?
16 A  It came from the $100,000.
17 Q  Okay. Shady Roost Lodge, that's a fishing resort
18    in Ontario, right?
19 A  Yes.
20 Q  Is there a mortgage against that property?
21 A  I'm not sure if there's a mortgage or a credit
22    facility against the property.
23 Q  Do you think somehow it's encumbered by some
24    debt?
25 A  Yes.

Page 50

```
 1  Q   And how much do you think that debt is?
 2  A   I would be guessing. Five or 600,000, I'm not
 3      sure.
 4  Q   Okay. Let me show you Schedule F, the front page
 5      of Schedule F. The Alliance Bank entry, in the
 6      middle column it says 6/8/09, and then it says,
 7      all of the debtor's ownership interest in Jacob
 8      Holdings of Nestor Falls. What does that mean?
 9  A   I believe it means that the two shareholders
10      pledged their stock for the loan.
11  Q   Okay. The date there is June 8 of 2009, and
12      that's --
13  A   Oh, I don't believe the date is correct.
14  Q   Okay. When do you think that happened? I'm not
15      looking for an exact date, just a rough time
16      frame.
17  A   A year or two or three before.
18  Q   Okay. In your Statement of Financial Affairs,
19      you indicate that JP Morgan Chase seized some
20      funds from an investment account in May of '09 --
21  A   Yes.
22  Q   -- but the number isn't in here. Do you know how
23      much they seized? Give me a range if you don't
24      know. Was it more than $5,000?
25  A   Between five and ten, I believe.
```

Page 51

```
 1  Q   Okay. What investment account did that come out
 2      of?
 3          MR. CUTLER: Mr. Seaver, I think I have
 4      records at my office on that, and we'll be happy
 5      to supply them.
 6          THE TRUSTEE: Okay, great.
 7  BY THE TRUSTEE:
 8  Q   Did you give Tamitha Hecker an expensive fur coat
 9      last December?
10  A   No, I didn't.
11  Q   Okay. Did you buy one?
12  A   Yes, I did.
13  Q   What happened to it?
14  A   I gave it to Christi Rowan.
15  Q   Okay. And how much was that coat; how much did
16      you pay for that coat?
17  A   60,000.
18  Q   6-0?
19  A   Yes.
20  Q   60,000, okay. Does she still have that coat?
21  A   I'm not sure.
22  Q   And I'm looking now at the transfer section of
23      the Statement of Financial Affairs, the gift
24      section, in particular. And I see on the first
25      page there the transfers to Tamitha.
```

Page 52

```
 1          MR. MOHRMAN: Hold on.
 2          THE TRUSTEE: Sure.
 3  BY THE TRUSTEE:
 4  Q   It's Item 7 in the Statement of Financial
 5      Affairs.
 6  A   Yes, okay.
 7  Q   All right. The Rolex watch that you gave to
 8      Tamitha that's scheduled there, was that --
 9      that's not one of the Rolex watches that was on
10      that list we went through awhile ago?
11  A   No, it wasn't.
12  Q   Okay. How much did you pay for that Rolex watch
13      that you gifted to her?
14  A   I believe it's $60,450.
15  Q   Okay. And then on the next page, still at this
16      same section, there are a number of transfers
17      here to family members. And I'm sure I can get
18      those addresses from Mr. Cutler, correct?
19  A   Oh, sure. Yes.
20  Q   Okay. And then Chris McIntire, business
21      associate, a Hublot watch, $20,000. It just says
22      within one year of petition date. Can you narrow
23      that for me a little more?
24  A   To the best of my knowledge, it was one year. He
25      was the partner in HogRider.
```

Page 53

```
 1  Q   Okay. And it was just a gift?
 2  A   And, Mr. Seaver, it was a Rolex or a Hublot, but
 3      I believe it was a Hublot. I didn't call him up
 4      and ask him, but I know I gave him a watch.
 5  Q   Okay. And the CM Rowan that's here at this item,
 6      that's Christi Rowan?
 7  A   Yes, it is.
 8  Q   Okay. Who is J -- Well, I'm on the next page
 9      here now, page 8. There are actually page
10      numbers on this section. It says page 8 up at
11      the top. There's a J. Robb that received $10,000
12      cash. Who is J. Robb?
13  A   Jessica Robb.
14  Q   What's her relationship to you?
15  A   She was a friend.
16  Q   Okay. And does Mr. Cutler have her address?
17      Well, would you get it to Mr. Cutler if he
18      doesn't?
19  A   Yes, yes.
20  Q   Why did you give Ms. Robb $10,000?
21  A   They needed money for personal things.
22  Q   Who's they?
23  A   She.
24  Q   Okay. Is she here in town?
25  A   Yes, she is.
```

Page 54

1  Q   All right.  Item 8 of the Statement of Financial
2  Affairs, right down below this, there are
3  gambling losses here.  Do you have documents that
4  would verify those losses?
5  A   Yes.
6  Q   All right.
7  A   We'll get them to you.
8  Q   Okay, great.  And I saw in the payments that were
9  made within the specified time period, I saw -- I
10  think it was -- Was it $50,000 to Mirage; do you
11  remember?  I know --
12  A   I believe it's on the schedules.
13  Q   Yeah.  Whatever the number --
14  A   Yes.
15  Q   -- in fact, was that --
16  A   Yes.
17  Q   -- a payment on old debt to Mirage?
18  A   Yes.
19  Q   Okay.  The court reporter is trying to tell us --
20  A   She got our attention.
21        MR. CUTLER:  You just did it again.
22  BY THE TRUSTEE:
23  Q   All right.  Still in your Statement of Financial
24  Affairs, Item 12, safe deposit boxes, there's
25  reference to Donna Rizner.  Who is Donna Rizner?

Page 55

1  A   She had been a long-time associate, left and came
2  back.  She was like administrative assistant and
3  came back in HR.  And years ago, when she was
4  administrative assistant, we had a safe deposit
5  box at Wells Fargo.  It might be ten years old.
6  Q   Is it still there?
7  A   No, she closed it.  And the reason she closed it,
8  we didn't even know it existed, is that they
9  debited her Visa card or personal credit card to
10  say, the expense of your safe deposit box.  She
11  went over there and she opened it up, and there
12  was nothing in it.
13  Q   Do you, Mr. Hecker, do you have access to a safe
14  deposit box anywhere in this country?
15  A   No, I don't.
16  Q   All right.  There's one listed here that is
17  apparently closed now at Lake State Bank, and it
18  says that Chip Lohemiller also had access.
19  A   Yes.
20  Q   Who's Mr. Lohemiller?
21  A   Mr. Lohemiller is the individual who did the
22  construction on our house in Cross Lake and runs
23  a maintenance and repair business in Cross Lake
24  for properties.
25  Q   All right.  And he owns a company, right?

Page 56

1  A   Yes, he does.
2  Q   And what's the name of that company?
3  A   Cross Lake something.
4  Q   A property management company?
5  A   Yes, that could be true.
6  Q   Okay.  Why were you sharing a safe deposit box
7  with him?
8  A   He's a former Minnesota Viking, and we'd become
9  friends.  And from time to time he needed the
10  ability to have cash to pay vendors or work on
11  the house and do a draw-down, whatever the case
12  might be.  So I wasn't uncomfortable with him
13  having a safe deposit box for -- it's maybe five
14  years.
15  Q   So would you put cash in there for him to use?
16  A   Originally.
17  Q   Okay.  When the construction was going on?
18  A   Before.  He did construction for five years.  He
19  not only built the house in Cross Lake, he built
20  each of the adjoining properties and did some
21  other work for us.
22  Q   Okay.  Have you paid any money to him or his
23  company in the last -- well, let's just say since
24  May 1st?
25  A   It's listed in the schedules.  I believe so.

Page 57

1  Q   But I'm asking you -- I'm taking that question
2  further.  Your schedules would have only covered
3  up to the date of filing.  Have you paid him any
4  money since then --
5  A   Since the --
6  Q   -- or his company?
7  A   I paid -- Since the filing I've paid 25,000 on
8  his bill and Tamitha paid 5,000.
9  Q   All right.  The 20,000 you paid, where did that
10  come from?
11  A   Twenty-five.
12  Q   Okay.
13  A   It came from the hundred that I got an advance on
14  or the loan on.
15  Q   Okay.  What did you owe that money for; why was
16  the money owed?
17  A   For services on three houses, installing the
18  docks and the landscaping and the maintenance and
19  things like that that come up.
20  Q   He takes care of Cross --
21  A   Yes.
22  Q   -- Lake?  You've got to remember, wait until I'm
23  done.  Jacob Hecker.  I'm still on the Statement
24  of Financial Affairs, paragraph 11, Jacob
25  Hecker.  That's your son, right?

Page 58

1  A   That's correct.
2  Q   Okay.  And there's reference there to a transfer
3      to minor account, with an ending balance of a
4      certain amount.  Have you transferred any money
5      into that account in the last year?
6          MR. CUTLER:  Which item is it?
7  BY THE TRUSTEE:
8  Q   Oh, I'm sorry.  It's Item 14 of the Statement of
9      Financial Affairs, on the second page of that.
10     It's page 11 up at the top.
11 A   I believe about seven or eight years ago we
12     opened an account for him with UBS, and it's in
13     his name and the stock broker has managed the
14     account.
15 Q   Have you contributed any funds since that time?
16 A   No.
17 Q   Okay.  All right.  And turn back to the page just
18     before this.  Still at Item 14, there's reference
19     to North State Financial Corp.  what is that
20     company, sir?
21 A   North State Financial is a lending company that
22     during the course of the last 15 years financed
23     vehicles and other things for wholesale car
24     dealers, basically equipment, whatever the case
25     might be.

Page 59

1  Q   Okay.  Now, your Statement of Financial Affairs
2      says that you're holding boats, inventory,
3      et cetera, and it goes on after that.  But what
4      boats are you holding for North State Financial
5      Corp.?
6  A   Two of the boats -- or three of the boats are at
7      Cross Lake.  They're under the UCC filing for
8      Bremer Bank and titled in North State.
9  Q   And those three boats are what?
10 A   I believe there's a Cobalt, a Malibu and some
11     kind of dingy.
12 Q   All right.  Have those boats always been at Cross
13     Lake since they were purchased?
14 A   Yes.
15 Q   All right.  When was the Cobalt purchased?
16 A   Three years ago.
17 Q   All right.  And are you the only one who's used
18     that Cobalt since it was purchased?
19 A   Yes.
20 Q   And it's been at Cross Lake the whole time?
21 A   Yes.
22 Q   Have you made any attempts to sell that Cobalt?
23 A   I visited with Bremer yesterday.  No.
24 Q   Okay.  You've just -- It's just been yours to use
25     personally, right?

Page 60

1  A   It's been in the business, but I've used it.
2  Q   Well, what business use were you making of it in
3      Cross Lake?
4  A   Well, I was in the business of buying and selling
5      things, and I paid way too much when I bought it.
6  Q   How much did you pay?
7  A   I would be guessing today, but 125,000.
8  Q   Okay.  And when you say you, was it Denny Hecker
9      personally who bought it?
10 A   North State.
11 Q   And it's titled in North State, right?
12 A   Yes, it is.
13 Q   And is Bremer Bank on the title?
14 A   Bremer Bank has a UCC filing of all the assets of
15     North State.
16 Q   Is Bremer Bank on the title?
17 A   I'm not sure.
18 Q   Okay.  And this other boat, a Malibu, is that the
19     ski boat?
20 A   Yes, it is.
21 Q   Okay.  And that's a Rib; it's referred to as a
22     Rib, R-I-B, isn't it?  Does that ring any bells
23     for you?
24 A   No.
25 Q   It doesn't --

Page 61

1  A   It's referred to as a Malibu.
2  Q   Okay.  And when was that purchased?
3  A   September of '07, April of '08, somewhere in that
4      time season.
5  Q   I'm sorry, I -- '07 or --
6  A   September of '07 to March of '08, April of '08.
7  Q   Okay.  And it's been there at Cross Lake ever
8      since --
9  A   Yes.
10 Q   -- you purchased it?  Here, let me just show you
11     a page from an insurance policy that I received
12     through my request for documents.  There is --
13     There are a list of boats on here, and there's
14     something called a 2003 Nautica Rib --
15 A   Yes.
16 Q   -- 13-foot.  What's that?
17 A   It's my son's boat.  It's like an inflatable kind
18     of little boat.
19 Q   Okay.  And maybe this will be the boat I'm about
20     to describe to you.  There's a boat there that
21     looks like it's a one- or two-person boat, has a
22     cockpit in it, has a motor in back.
23 A   It's a Mouse boat.  It's a Mouse boat.
24 Q   Okay.  Named after Mickey Mouse or --
25 A   It came from Disney World.

Page 62

1  Q  Okay.  Who owns that?
2  A  My daughter.
3  Q  Who bought it?
4  A  I gave it to her two years ago.
5  Q  Okay.  When did you buy it and how much did you
6     pay for it?
7  A  The summer of '07 or '06 and paid a thousand
8     dollars for it.
9  Q  Okay.  Here, let me show you again, Mr. Hecker, a
10    page from this insurance policy.  And there's a
11    1994 Harley Davidson on here.  Who is that titled
12    in?
13 A  North State.
14 Q  Okay.  2003 Harley Davidson VRCA?
15 A  North State.
16 Q  2006 Polaris Outlaw?
17 A  I believe North State.
18 Q  Is that an ATV; do you know?
19 A  I believe so.
20 Q  2006 Harley Davidson VRSCA?
21 A  I believe that's the motorcycle I gave to Erik
22    Dove.
23 Q  Then down a little farther there's a 2007 Harley
24    Davidson FLHR.  Who is that titled in?
25 A  I'm not sure.  Both of those I'm not sure.

Page 63

1  Q  There's a 2007 Harley Davidson FXST right under
2     that, right?
3  A  Yes, and I'm not sure.
4  Q  All right.  Who has possession of all those
5     motorcycles?  Let's take the Erik Dove one out of
6     the equation for a minute.  The rest of them.
7  A  Three of them are in Cross Lake.
8  Q  Okay.  The others, where are they?
9  A  There's one in Medina.
10 Q  At where?
11 A  Hunter.
12 Q  Okay.
13 A  And I don't know -- The other two we'll have to
14    research.
15 Q  Okay.  And the ones at Cross Lake, how long have
16    they been at Cross Lake?
17 A  On and off for maybe the last year.
18 Q  All right.  When was the '94 Harley purchased?
19 A  In '94.
20 Q  Oh, really.  Was it purchased by North State
21    back --
22 A  Yes.
23 Q  -- in 1994?
24 A  Yes.
25 Q  And you're the only one that's used it since

Page 64

1     then, right?
2  A  I believe so.
3  Q  Was it purchased for resale?
4  A  It was purchased under the North State line of
5     credit but had no covenants.
6  Q  Right.  Was it purchased --
7  A  It was titled in North State.
8  Q  Was it purchased for resale?
9  A  At the time, yes.
10 Q  The 2003 Harley Davidson, when was that
11    purchased?
12 A  I'm not sure.  We'll have to get the details.
13 Q  Okay.  Were all of these Harleys purchased for
14    resale?
15 A  Yes.
16 Q  Has anyone used any of those Harleys other than
17    you and Erik Dove?
18 A  Some of them have been used for two or three
19    years.
20 Q  The question, though, was has anyone other than
21    you or Erik Dove ever used them?
22 A  To the best of my knowledge, no.
23 Q  Okay.  What did Bremer have to say yesterday in
24    your conversation with them?  Do they want this
25    collateral?

Page 65

1  A  I talked to the president, Steve Meads.  And not
2     only do they have it as collateral, they had a
3     real estate development they took about a
4     $6 million loss on.  And his comment to me was --
5     I said, we're embarrassed for the loss.  And he
6     said the economy is pretty self-explanatory, with
7     GM and Chrysler going bankrupt and the world
8     coming to an end in the automobile industry, that
9     they would like to facilitate sometime in August
10    a liquidation of their collateral.  They have a
11    million five outstanding.
12 Q  Who's their attorney; do you know?
13 A  I have no idea.
14 Q  Okay.  Well, just so we're clear here, based on
15    what I'm hearing on the testimony, it doesn't
16    sound to me like those items were held for sale
17    in the trade; it sounds like they were held for
18    personal use, and I believe they're property of
19    the bankruptcy estate.  And you don't need to
20    respond to this.  You're certainly welcome to --
21 A  I'd like to.
22 Q  But I'm going to communicate with Bremer Bank and
23    tell them exactly that.  But go ahead with what
24    you were going to say, sir.
25       MR. CUTLER:  No, you don't need to.

Page 66

1     We'll reserve our rights, if any, with respect to
2   that issue.
3       THE TRUSTEE: Sure.
4 BY THE TRUSTEE:
5 Q   At Schedule F, and you don't really need to look
6   at this, I see there's Inter Bank as a creditor.
7   It says that your debt to them is personal
8   guarantee, Sidney Holdings of Eden Valley, LLC.
9   I mean, you're welcome to look at it, but what's
10   Sidney Holdings of LLC?
11 A   It's a residence in Eden Valley.
12 Q   Okay. And who lives there?
13 A   My sister.
14 Q   Okay. And does she make payments on that home?
15 A   No, she doesn't.
16 Q   Okay. Who does?
17 A   I've made all the payments since it happened.
18 Q   Denny Hecker personally?
19 A   Yes.
20 Q   All right. Did Sidney Holdings ever have a bank
21   account?
22 A   I'm not sure.
23 Q   Okay. Is there an encumbrance against that
24   property?
25 A   The schedule shows. Yes, there is.

Page 67

1 Q   How much equity do you think there is in that
2   property?
3 A   I don't believe there's any.
4 Q   Okay. How long has the mortgage been there, sir?
5 A   Since the house was purchased.
6 Q   Okay. Now -- Oh, and I need to state for the
7   record, I have received a copy of a 2007 tax
8   return from Mr. Hecker. Is that a true and
9   correct copy of the most recent return you filed,
10   sir?
11 A   You received it from us?
12 Q   It came through your attorney, Mr. Cutler.
13 A   I believe so.
14 Q   And you're on extension for 2008; is that right?
15 A   That's correct.
16 Q   All right. And I also received a copy of a 2006
17   return. It's accurate to say that your 2007
18   return, and I can show you this if you want to,
19   for adjusted gross income it was a negative
20   28 million or so, right?
21 A   Yes.
22 Q   Okay. Mr. Hecker, there was -- shortly before
23   you filed bankruptcy there was what's called a
24   restructuring agreement with TCF Bank, correct?
25 A   Yes.

Page 68

1 Q   All right. That's the title of the document.
2   I'm just reading it off there.
3 A   I'm not sure what it's called, but...
4 Q   Okay. Describe for me, as best you can, your
5   understanding of what was accomplished by that
6   agreement.
7 A   What date is that document dated?
8 Q   It says June 3rd, the day before you filed
9   bankruptcy. It says effective June 3rd.
10 A   Okay.
11 Q   And I'm just looking for you -- from you a
12   general description of what that restructuring
13   accomplished.
14 A   It accomplished returning the Aspen property,
15   which was in default, and returning the Medina
16   property, which was in default.
17 Q   Did you own both of those personally?
18 A   No.
19 Q   Okay. And what did you get in return for that?
20 A   Well, they forbeared my personal guarantee on
21   both, and they gave me the opportunity to have
22   Cross Lake as the homestead.
23 Q   All right. Are you making any payments on the
24   Cross Lake homestead?
25 A   I'm paying the taxes and utilities.

Page 69

1 Q   Did this restructuring agreement effectively
2   provide that all you have to pay until the note
3   is payable in full in four years is real estate
4   taxes?
5 A   That's incorrect.
6 Q   Well, tell me what it did, then.
7 A   For a period of twelve months, I believe, it was
8   no interest or principal, but the principal and
9   interest is added onto the end of the note.
10 Q   Yep. Do you have to pay any interest prior to
11   the note coming due in four years?
12 A   Yes.
13 Q   Okay. Do you start making interest payments at
14   some point?
15 A   Yes.
16 Q   When is that?
17 A   At the end of twelve months.
18 Q   Okay. This restructuring agreement also in the
19   whole package, there was -- there were also a
20   couple of leases, correct?
21 A   They leased back the Medina property and the
22   Aspen property --
23 Q   All right.
24 A   -- for a short period of time.
25 Q   All right. So there was the Medina and the Aspen

## Page 70

1    leases, and then there were leases at Cross Lake,
2    also, right?
3  A  There are leases at Cross Lake, yes.
4  Q  All right.  And I'm showing you one here, which
5    is between Jacob Holdings of Cross Lake and
6    Family Holdings of Minnesota.
7  A  Yes.
8  Q  What's Jacob Holdings of Cross Lake, a business
9    entity?
10  A  It's an LLC, yes.
11  Q  Okay.  And who owns the interest in that LLC?
12  A  I believe I do.
13  Q  Okay.  Family Holdings of Minnesota, what's that?
14  A  It's the individual who is renting the property.
15  Q  And who's that?
16  A  His name is William Plumber.
17  Q  Okay.  Is Mr. Plumber a long-time associate of
18    yours?
19  A  Yes, he is.
20  Q  All right.  This residential lease right down at
21    the bottom of the page I'm showing you, which is
22    paragraph 4, calls for an immediate payment of
23    $24,000 in rent.  Did that get paid?
24  A  We amended that.  It did not get paid.
25  Q  All right.  When did you amend it?

## Page 71

1  A  I don't know.  I'd have to look.
2  Q  Did you amend it after you filed bankruptcy?
3  A  I don't know.
4  Q  I'm not asking you for a date, I'm asking you --
5  A  I said I don't know.
6  Q  -- before or after?  The security deposit of
7    $2,000 called for by this same lease in
8    paragraph 6, did that ever get paid?
9  A  Can I just see the document?
10  Q  Sure.  It's right here.
11  A  Yes, I believe it did.
12  Q  And where did that money go?
13  A  Either to one of my accounts or it was in cash.
14    I don't recall.
15  Q  All right.  So is it accurate to say that no
16    lease payments have been made on this lease yet?
17  A  I've got to check.  I'm not sure.
18  Q  And there was another lease of the other guest
19    house --
20  A  Yes.
21  Q  -- for the Cross Lake property?
22  A  Yes.
23  Q  And I'm showing you that lease here.  And that's
24    between Jacob Holdings of Cross Lake, Bill
25    Prohovsky and Dan Aldrich, correct?

## Page 72

1  A  Yes.
2  Q  All right.  Who is Bill Prohovsky?
3  A  My father-in-law.
4  Q  Okay.  And who is Dan Aldrich?
5  A  My son-in-law.
6  Q  All right.  And this lease has the same
7    provision, close to the same provision in
8    paragraph 4 about an immediate payment of $24,000
9    in rent.
10  A  Yes, it does.
11  Q  Did that get paid?
12  A  I'd have to check.
13  Q  Do you recall anything about getting paid?
14  A  I don't recall at this time.
15  Q  Okay.  It has the same provision for a security
16    deposit, $2,000.  Did that get paid?
17  A  I believe it did.
18  Q  Okay.  And where would that money have gone?
19  A  Deposited in one of the accounts or cash.
20  Q  Okay.  Have any lease payments been made on that
21    lease?
22  A  I'd have to research to find out.
23  Q  What would you research?
24  A  To check and see if any of the deposits came into
25    the bank.

## Page 73

1  Q  Where would the deposits have been made?
2  A  Who owns the property?
3  Q  I'm asking you where the deposits --
4  A  I don't have the document in front of me.  I'm
5    not sure who --
6        MR. MOHRMAN:  Do you want to see the
7    document again?
8        THE DEBTOR:  Yeah.
9  BY THE TRUSTEE:
10  Q  Jacob Holdings.
11  A  It would either be Jacob Holdings or my personal
12    accounts.
13  Q  Does Jacob Holdings have a bank account?
14  A  Yes, it does.
15  Q  Where is that?
16  A  I don't know.  We can find that for you.
17  Q  Who's the signatory on the account?
18  A  Mr. Seaver, we had a hundred bank accounts.
19  Q  Yeah.  I'm --
20  A  I'm not sure who is the only signer or who signed
21    and made the deposits.  We can find that
22    information.
23  Q  Okay.  And you'll do that, right?
24  A  Yes.
25  Q  Okay.  Is Mr. Aldrich employed?

Page 74

```
 1   A   He has a company.
 2   Q   What's the name of the company?
 3   A   I'm at a loss for the name.
 4   Q   Okay.  Mr. Hecker, I sent a letter to your
 5       attorney just recently asking, among other
 6       things, that you specify what items of personal
 7       property you're claiming as exempt as household
 8       goods.  And I'm not going to ask you here today
 9       what those are, but I just want to make certain
10       that you knew that I'm asking you to tell me
11       exactly what it is that you want to claim as
12       exempt in whatever homes you want to.  You'll do
13       that, right?
14   A   Yes.
15   Q   Okay.  I received a letter from Mr. Cutler dated
16       July 13.  I'm sorry.  It's not from Mr. Cutler,
17       it's from Doug Nusbaum at his firm.  And he says
18       various things, but there is a list attached to
19       it in which there's a list of items that were
20       gifted to your children, he indicates.  Are there
21       any documents to verify those gifts?
22   A   First of all, they were registered in my name
23       because the children are 14 and 8.  So I wouldn't
24       have any document between myself and an
25       8-year-old or a 14-year-old.
```

Page 75

```
 1   Q   Sir, my question is, are there any documents to
 2       verify those gifts to them?
 3   A   No.
 4   Q   Okay.  When was the property in Cabos purchased,
 5       Mr. Hecker?
 6   A   Approximately three to five years ago.
 7   Q   Okay.  What was the original purchase price?
 8   A   I believe a million two.
 9   Q   Okay.  And where did the funds come from to
10       purchase it?
11   A   I believe Wells Fargo.
12   Q   Okay.  Wells Fargo didn't finance the entire
13       million dollar purchase, though, did it?
14   A   No.
15   Q   Okay.  Did Denny Hecker also pay some money
16       towards the purchase?
17   A   Yes.
18   Q   Okay.  Does Jacob Holdings of Ventanas, LLC, have
19       a bank account?
20   A   I believe they do.
21   Q   Where is that?
22   A   We can provide that for you.
23   Q   Okay.  Does Jacob Holdings of Ventanas have any
24       business?  Do you understand my question?
25           MR. CUTLER:  Other than owning the
```

Page 76

```
 1       condo?
 2   BY THE TRUSTEE:
 3   Q   Yeah.  Let me rephrase it.  Is the only thing
 4       that Jacob Holdings of Ventanas, LLC, exists for
 5       is to hold that property?
 6   A   Yes.
 7   Q   Okay.  Why did you put it in the name of that LLC
 8       rather than in your name personally?
 9   A   Can I just ask a question just for a minute?
10           (Discussion held off the record between
11           the Debtor and his attorney.)
12           THE DEBTOR:  All of the entities that I
13       own were in LLCs because I had a premarital
14       agreement that over the period of time,
15       everything that I acquired would be in the LLCs
16       and my spouse wouldn't be -- have any of the
17       upside or any of the downside.
18   BY THE TRUSTEE:
19   Q   Okay.  So if it had been in your name personally
20       -- And I'll just stick to this one example.  So
21       if Cabos had been in your name personally, your
22       understanding is it wouldn't have been protected
23       by the antenuptial agreement?
24   A   I believe so.
25   Q   Okay.  Who paid the mortgage on the Cabos
```

Page 77

```
 1       property, was it you personally?  Well, I guess
 2       I'm assuming stuff that may not be correct.  Is
 3       there a mortgage on it?
 4   A   There's no mortgage.
 5   Q   Okay.  Who has paid any related expenses for the
 6       Cabos property?  Was it you, Denny Hecker?
 7   A   It was me probably through Las Ventanas, LLC
 8   Q   What source of revenue did Las Ventanas, LLC
 9       have other --
10   A   Zero.
11   Q   Just Denny Hecker?
12   A   Yes.
13   Q   Okay.  Here, let me show you something that's in
14       your Schedule C.  I'm sorry.  It's in the
15       Statement of Financial Affairs.  There's a
16       transfer to Jacob Holdings of Las Ventanas on 7/1
17       of 2008 of $174,000.  Is that related to the
18       Cabos property or is that something else?
19   A   I believe it would be the Cabos property.
20   Q   Okay.  Do you know what that would be for?
21   A   I have no idea.  We'd have to research it and
22       give you the documents.
23   Q   Okay.  Have you driven a Mazeratti in the last
24       two years?
25   A   No.
```

1  Q  Have you had one in your possession in the last
2     two years?
3  A  No.
4  Q  Has there been one at your Cross Lake home in the
5     last two years?
6  A  No.
7  Q  Have you driven a Bentley in the last two years?
8  A  Yes.
9  Q  When was that, the last time you drove it?
10 A  I believe the last time I drove it might have
11    been 60 days ago.
12 Q  Who owns that Bentley?
13 A  US Bank.
14 Q  Was it a lease?
15 A  It was originally titled to Advantage Rent-A-Car
16    and it's a US Bank financed car.  It's being
17    turned back.
18 Q  Okay.  So when you say US Bank owns it, you mean
19    they have the loan on it?
20 A  Yes.
21 Q  Do you know anything about a motor home being
22    sold to the McCarthy Auto Dealership?
23 A  Yes.
24 Q  Tell me what you know about that.
25 A  It was purchased three or four years ago for

1     approximately 800,000, and the company that owned
2     it sold it for 300,000 to McCarthy.
3  Q  Okay.  And that --
4  A  There was 300,000 worth of debt on it.
5  Q  I'm sorry?
6  A  There was 300,000 worth of debt on it.
7  Q  Okay.  So it was sold for the exact amount that
8     was owed?
9  A  About.
10 Q  About.  Okay.  And that was in April, right?
11 A  Yes.
12 Q  What company was it titled in?
13 A  Mr. Seaver, I don't --
14 Q  Just one of your companies?
15 A  Yes.
16 Q  Okay.  And Denny Hecker didn't receive anything
17    from that, right?
18 A  No.
19 Q  What's Fidelity Warranty Services?
20 A  It's a warranty company that provides warranties
21    for people who buy cars.
22 Q  Do you own an interest in that entity?
23 A  No, I don't believe so.
24 Q  Did you at one time?
25 A  I don't believe so.

1  Q  Okay.
2  A  We had a commission agreement.
3  Q  Okay.  Tell me about that.  What's the commission
4     agreement?
5  A  We would receive commission based upon sales of
6     products.
7  Q  When you say we, who does that mean?
8  A  We, the company.
9  Q  Not Denny Hecker personally, or is it?
10 A  I don't believe so.
11 Q  Okay.
12 A  There's documents.  There's an agreement that we
13    did for you.
14 Q  Is there some large holdback that's being held by
15    somebody in Florida?
16 A  Well, the reinsurance company is holding back to
17    offset the claims.
18 Q  Okay.  And that's Moran, right?
19 A  Yes.
20 Q  All right.  And you have that listed in the
21    schedules, right, the debt to Moran?
22 A  Yes.
23 Q  Is that a personal debt or is that guaranteed?
24 A  It's guaranteed by myself.
25        THE TRUSTEE:  Okay.  Well, let's just

1     take a short break here, and by short I mean ten
2     minutes.  If you guys want more, that's fine, but
3     I'm just thinking a short break.  And then I'm
4     going to open the floor up to others here
5     shortly.  I have more questions, but I want to
6     give other people a chance to ask what they
7     want.
8        (Break taken.)
9        CONTINUED EXAMINATION
10 BY THE TRUSTEE:
11 Q  Before I open it up to others, I do have a few
12    more questions that I'm going to ask here.  The
13    first one is -- And you understand, Mr. Hecker,
14    that you're under oath, still under oath, right?
15 A  Yes.
16 Q  All right.  Here, let me show you an MLS
17    listing.  It's for a property at 34515 Happy
18    Landing Road in Cross Lake.  Are you familiar
19    with that property?
20 A  Yes.
21 Q  All right.  Tell me about that property.
22 A  It's a vacant lot.
23 Q  Okay.  Is there a boat lift there?
24 A  I have no idea.
25 Q  Okay.  Who owned -- Or who owns that lot?  Was it

Page 82

```
 1      titled in one of the business entities?
 2   A  I believe so.
 3   Q  All right.  What's the status of that lot right
 4      now; what's happening with it, other than being
 5      for sale?
 6   A  It's being foreclosed by Riverwood Bank.
 7   Q  And does Riverwood Bank have a mortgage on it?
 8   A  Yes, they do.
 9   Q  When did they get that mortgage?
10   A  I'm not exactly sure.
11   Q  Was it within 90 days of your filing?
12   A  No.
13   Q  Was there some sort of transaction where the LLCs
14      got a lower interest rate from some banks but, in
15      exchange, gave a mortgage on that property before
16      the bankruptcy was filed?
17   A  I have no idea.
18   Q  That doesn't ring any bells with you?
19   A  No.
20   Q  All right.  Mr. Hecker, you have been sued in
21      this bankruptcy case by Chrysler Financial
22      Services, correct?
23   A  Yes.
24   Q  And I'm just going to -- I printed a copy of the
25      complaint this morning without all of the
```

Page 83

```
 1      exhibits, and that's a copy of the complaint.  I
 2      want to draw your attention specifically to some
 3      allegations that are made in that complaint
 4      starting at page 5, paragraphs 17 through 19.
 5      Would you just take a minute or however long it
 6      takes to read through those paragraphs?  I don't
 7      want you to read them out loud.  I just want you
 8      to read through them.
 9          MR. MOHRMAN:  Before Mr. Hecker reviews
10      these paragraphs, is it your intention to ask
11      Mr. Hecker questions regarding the allegations in
12      the adversary complaint?
13          THE TRUSTEE:  It is.
14          MR. MOHRMAN:  Under the bankruptcy
15      rules, once an adversary proceeding is commenced,
16      any questions related to the adversary complaint
17      and any discovery regarding the adversary
18      complaint must take place pursuant to the Federal
19      Rules of Civil Procedure.
20          THE TRUSTEE:  Really.  What bankruptcy
21      rule is that, sir?
22          MR. MOHRMAN:  It's pursuant to a
23      case --
24          THE TRUSTEE:  But decided by the --
25          MR. MOHRMAN:  -- out of the United
```

Page 84

```
 1      States Bankruptcy Court for the District of New
 2      Jersey, In Re:  2435 Plainfield Avenue,
 3      Incorporated.  The citation is 223 Bankruptcy
 4      Reporter 440, 1998.
 5          THE TRUSTEE:  Do you have --
 6          MR. MOHRMAN:  If I could read to you
 7      from the case it says, the majority of courts
 8      that have addressed the issue have prohibited a
 9      Rule 2004 exam of parties involved in or affected
10      by an adversary proceeding.
11          THE TRUSTEE:  Stop right there,
12      Mr. Mohrman.  Are you under the impression that
13      this is a Rule 2004 examination?
14          MR. MOHRMAN:  I think under other case
15      law --
16          THE TRUSTEE:  Are you under the
17      impression that this is a Rule 2004 examination?
18          MR. MOHRMAN:  I'm sorry.  I was going
19      to answer.  It is my understanding that the
20      parameters of the Rule 2004 examination and the
21      examination of Debtor at the first Meeting of
22      Creditors is the same.
23          THE TRUSTEE:  Where do you get that?
24          MR. MOHRMAN:  That's my understanding
25      of the rules.
```

Page 85

```
 1          THE TRUSTEE:  Understanding based on
 2      what rule?
 3          MR. MOHRMAN:  That's my understanding
 4      under the bankruptcy law.
 5          THE TRUSTEE:  What law?
 6          MR. MOHRMAN:  Well, you interrupted me
 7      earlier, so if I can continue --
 8          THE TRUSTEE:  Does it mention
 9      Section 341 of the bankruptcy code at all in that
10      case?
11          MR. MOHRMAN:  There are --
12          THE TRUSTEE:  Does it?
13          MR. MOHRMAN:  Sir, I'm not being
14      examined here.
15          THE TRUSTEE:  Well, you're offering
16      some testimony here.
17          MR. MOHRMAN:  I am not offering any
18      testimony, sir.  I'm an attorney for the debtor,
19      and I would ask, as a courtesy, that you allow me
20      to complete what I'm going to say.  And then if
21      you want to say something, you can do that.  As
22      you -- the court reporter told Mr. Hecker
23      earlier, it's difficult for her to take down
24      things when two people are talking at once.
25          THE TRUSTEE:  Okay.  Finish what you're
```

Page 86

1  going to say.
2      MR. MOHRMAN:  Thank you.  The case law
3  that's cited in this case, and there's a number
4  of string cites, make it very clear that once an
5  adversary proceeding is commenced, discovery may
6  be had only pursuant to the discovery provisions
7  of the Federal Rules of Civil Procedure.
8      So based on that, I am not going to
9  allow Mr. Hecker to answer questions related to
10  the complaint that's pending.
11      THE TRUSTEE:  Mr. Cutler, you're the
12  bankruptcy attorney here.  Do you think this
13  assessment is accurate?
14      MR. CUTLER:  I haven't made an
15  independent judgment.  I defer to Mr. Mohrman,
16  who's representing Mr. Hecker in connection with
17  the adversary proceeding Mr. Hecker has.
18      THE TRUSTEE:  Right, but you're
19  representing here at the 341, right?
20      MR. CUTLER:  Well, not having heard
21  your questions, it's a little hard to determine
22  if the debtor should respond to them or not.  But
23  the concern, of course, is that neither I nor
24  Mr. Mohrman have had adequate time to review the
25  pleading and the exhibits, which are voluminous.

Page 87

1  The allegations are serious.  There are rules of
2  evidence that will apply and rules of civil
3  procedure that will apply in that proceeding.
4  And the debtor is at a serious disadvantage here
5  depending on the scope and the nature of the
6  questions.  We have a lot of concern about that,
7  that we not jeopardize any defenses that
8  Mr. Hecker could present in connection with
9  that.
10  BY THE TRUSTEE:
11  Q   All right.  Have you read through those
12  paragraphs yet, Mr. Hecker?
13      MR. MOHRMAN:  Again --
14      THE TRUSTEE:  Mr. Mohrman, I'm not
15  talking to you.  I'm talking to Mr. Hecker.
16      MR. MOHRMAN:  -- I'm going to instruct
17  Mr. Hecker not to answer questions related to the
18  adversary complaint that's been filed, because
19  any examination regarding those allegations has
20  to be conducted in the case under the Federal
21  Rules of Civil Procedure.
22      THE TRUSTEE:  Do you think you might
23  want to wait until I actually ask him a question
24  before you do that?
25      MR. MOHRMAN:  Well, you asked him a

Page 88

1  question, to review the complaint.
2      THE TRUSTEE:  No, I'm telling him to
3  review the complaint.  When I get to my
4  questions, you can assert what it is that you're
5  asserting here and we'll let Judge Kressel decide
6  it.
7      MR. MOHRMAN:  Absolutely.
8  BY THE TRUSTEE:
9  Q   Have you read those paragraphs yet, Mr. Hecker?
10      MR. MOHRMAN:  You can answer that.
11      THE DEBTOR:  Yes.
12  BY THE TRUSTEE:
13  Q   All right.  Paragraph 16 says, among other
14  things, that you personally presented to Chrysler
15  Financial a letter dated November 7, 2007, a copy
16  of which is attached as Exhibit E.  Did you do
17  that?
18      MR. MOHRMAN:  Again, I'm going to
19  instruct him not to answer that question.
20  There's an adversary complaint pending.
21      THE TRUSTEE:  All right.  You've done
22  this.  I'm asking him questions.  I understand
23  what you're saying.
24      MR. MOHRMAN:  Okay.
25  BY THE TRUSTEE:

Page 89

1  Q   Mr. Hecker, let me show you Exhibit F from the
2  complaint.  Exhibit F from the complaint is a
3  letter on Hyundai letterhead that talks in the
4  first paragraph about Hyundai agreeing to
5  repurchase 4,855 vehicles from Walden Fleet
6  Services after they were purchased.  There's a
7  signature on a page of this.  Is that your
8  signature?
9      MR. MOHRMAN:  Again, I'm instructing
10  Mr. Hecker not to answer that question.  That
11  question is directed directly at allegations that
12  are contained in the adversary complaint that is
13  currently pending in this bankruptcy court.
14      THE TRUSTEE:  So you're not going to
15  let him tell me whether that's his signature --
16      MR. MOHRMAN:  That's correct --
17      THE TRUSTEE:  -- based on that New
18  Jersey case?
19      MR. MOHRMAN:  -- because I'm concerned
20  that you'll take the position that if I allow him
21  to answer questions regarding anything related to
22  the complaint, that he has waived any rights he
23  has under these cases.
24      THE TRUSTEE:  Any rights he has under
25  that New Jersey bankruptcy case.

**Page 90**

1  BY THE TRUSTEE:
2  Q   Look at this letter, if you would, Mr. Hecker.
3  Did you cause any alteration to be made in the
4  original letter from Hyundai Financial?
5           MR. MOHRMAN:  Again, I instruct
6  Mr. Hecker not to answer that question, because
7  that question is directly related to the
8  allegations that are made in the adversary
9  complaint.
10          THE TRUSTEE:  Also directly related to
11  financial matters in this bankruptcy case,
12  Mr. Mohrman, which I have an obligation to
13  investigate.
14          MR. MOHRMAN:  I understand that.  And
15  if you look at the case law that I researched,
16  the Court specifically discussed the tension
17  between the examination that takes place here and
18  what happens once an adversary complaint is
19  filed.
20          THE TRUSTEE:  All right.
21          MR. MOHRMAN:  And the way the courts
22  have come down on that -- If I may finish, sir,
23  the way the courts have come down on that, is
24  because the courts have stated that this
25  examination is somewhat akin to a fishing

**Page 91**

1  expedition but that once an adversary complaint
2  is filed, that all parties in the case are
3  protected by the discovery rules, that the
4  discovery rules then apply once an adversary
5  proceeding is commenced.  And that is --
6           THE TRUSTEE:  Mr. Mohrman, you can stop
7  the speech, please.  Do you have any Eighth
8  Circuit law that supports this position of
9  yours?
10          MR. MOHRMAN:  From the research --
11          THE TRUSTEE:  Do you have any?
12          MR. MOHRMAN:  Sir, I, again, would
13  request that you please not interrupt me.
14          THE TRUSTEE:  It's a "yes" or "no"
15  answer.
16          MR. MOHRMAN:  And, again, that might be
17  okay to say that to somebody you're examining
18  here, but I'm not under oath and I'm not -- I'm
19  an attorney.
20          THE TRUSTEE:  Okay.  Then I'm going to
21  have you stop testifying.
22          MR. MOHRMAN:  I'm not testifying, sir.
23  And I'm going to put my statement on the record.
24  My research showed yesterday -- I couldn't find
25  any Eighth Circuit authority on the issue, either

**Page 92**

1  at the Eighth Circuit level or at the District
2  Court level.  And I'm sure, as you're well aware,
3  the bankruptcy court here in Minnesota will rely
4  on bankruptcy court decisions from other
5  jurisdictions.  And from what I just read to you
6  from the New Jersey decision, it talked about the
7  majority of other courts.
8  BY THE TRUSTEE:
9  Q   All right.  Coming back to this adversary
10  complaint, Mr. Hecker, did you ever alter a
11  letter from Hyundai Financial before presenting
12  it to Chrysler Financial?
13          MR. MOHRMAN:  I'm going to instruct you
14  not to answer that question, Mr. Hecker.
15          THE TRUSTEE:  All right.  Well, we'll
16  see what the judge in this case has to say about
17  your instructions, Mr. Mohrman.
18          All right.  I'm going to open it up now
19  for questions from other people.  And those of
20  you who have --
21          MR. CUTLER:  Mr. Seaver, are you going
22  to open the floor up to creditors to ask
23  questions --
24          THE TRUSTEE:  Yes.
25          MR. CUTLER:  -- or anybody present?

**Page 93**

1           THE TRUSTEE:  Well, that's a good
2  distinction, Mr. Cutler.
3           THE TRUSTEE:  First of all, people who
4  have questions, just raise your hands.  Give me
5  an idea of how many people we might be talking
6  about here.  One.
7           Okay.  The IRS has some questions here,
8  so let's start with them.
9           Good point, Mr. Cutler.  We'll come
10  back to it if a need to be arises.
11          MR. MOHRMAN:  We would ask, Mr. Seaver,
12  that anybody who is asking questions identify who
13  they are and --
14          THE TRUSTEE:  Sure.
15          MR. MOHRMAN:  -- whether or not they're
16  a creditor in the bankruptcy case.
17          THE TRUSTEE:  And would you identify
18  yourself, sir?
19          MR. CLIFTON:  Sure.  Rich Clifton with
20  the Internal Revenue Service.  The Internal
21  Revenue Service is a creditor in this case with
22  Mr. Hecker, based on tax liens that we have
23  filed.
24          THE TRUSTEE:  Go ahead.
25

24 (Pages 90 to 93)

Page 94

1           EXAMINATION
2  BY MR. CLIFTON:
3  Q  I want to start with some real property
4     questions.  I think some of these have been
5     answered and maybe clarify some of them.  The
6     property at 1615 Northridge Drive, your value on
7     your schedules was a million one.  How did you
8     arrive at that?
9  A  We arrived at that as a general market condition
10    value.
11 Q  Did you check to see whether it was assessed that
12    by the county?
13 A  I think we looked at more appropriate sales in
14    the neighborhood.
15 Q  Well, the county has it at 1.8 million, so how do
16    you account for a $700,000 difference?
17         MR. CUTLER:  Do you want him to explain
18    why the county has it assessed at 1.8 million?
19 BY MR. CLIFTON:
20 Q  How did you come up with 1.1 compared to that?
21         MR. CUTLER:  He just told you.
22         MR. CLIFTON:  More specifically?
23         MR. CUTLER:  Than what he told you?
24 BY MR. CLIFTON:
25 Q  Yeah.  Who did you talk to to come up with that

Page 95

1     value?
2         THE TRUSTEE:  Just to help you a little
3     bit, these are Mr. Cutler's.  Those are his
4     original copies.  I believe those are the value
5     opinions from a real estate company in Cross
6     Lake.
7         MR. CLIFTON:  Okay.
8  BY MR. CLIFTON:
9  Q  So the 1.1, who did you talk to to get 1.1?
10 A  We looked at comps. in the neighborhood and came
11    up with that value.
12 Q  And did you have access to those comps. yourself?
13 A  They're on MLS.
14 Q  Okay.  So it's MLS you're using.  The condo at
15    53rd Avenue in Plymouth that you jointly own with
16    Kelly Hecker, that's your daughter, correct?
17 A  It's a town house.
18 Q  Okay.  Do you jointly own that with Kelly?
19 A  I cosigned for her, yes.
20 Q  And the two of you have always been the co-owners
21    of that property?
22 A  I believe so.
23 Q  And is there a mortgage on that property?
24 A  Yes, there is.
25 Q  And who pays that?

Page 96

1  A  She does.
2  Q  Okay.  Have you ever?
3  A  No, I don't believe I have.
4  Q  Do you know who the mortgage is with?
5         MR. CUTLER:  It should be on
6     Schedule D.
7  BY MR. CLIFTON:
8  Q  Okay.  The Cross Lake properties, were those ever
9     owned by any company or individual that you're a
10    part of or related to prior to the Jacob Holdings
11    showing as the title holder of those properties?
12 A  I don't believe so.
13 Q  No?
14 A  I don't believe so.
15         MR. CLIFTON:  Okay.  I don't recall.
16    Did we talk about Transcend Communications
17    earlier?  Randy, do you recall?
18         THE TRUSTEE:  I didn't ask him about
19    Transcend Communications.
20 BY MR. CLIFTON:
21 Q  Okay.  You show a two-and-a-half million
22    dollar --
23         MR. CUTLER:  Mr. Clifton, the lender on
24    13905 53rd Avenue North, Apartment 1 is listed in
25    Schedule D as Washington Mutual Bank.

Page 97

1         MR. CLIFTON:  Okay.
2         MR. CUTLER:  Sorry to interrupt.
3         MR. CLIFTON:  That's fine.
4  BY MR. CLIFTON:
5  Q  A question regarding Transcend Communications,
6     Incorporated.  Is that one of your companies?
7  A  I have an interest in the company.
8  Q  What is your interest?
9  A  I'm not sure.
10         MR. CUTLER:  It should be reflected in
11    the schedules in Exhibit B of the attachments.
12    You have a stock ownership interest in it?
13         THE DEBTOR:  Yes.
14 BY MR. CLIFTON:
15 Q  Do you know what percent your stock ownership
16    is?
17 A  Look in the schedule.
18         MR. CUTLER:  Is it less than
19    50 percent, Mr. Hecker?
20         THE DEBTOR:  I'm not sure.
21         MR. CUTLER:  There's an attachment to
22    Exhibit -- to Schedule B, Exhibit B-13 that has a
23    listing of the various ownership interests.
24         MR. CLIFTON:  Right, yeah.
25         MR. CUTLER:  And it should be reflected

Page 98

1   in that schedule.
2      MR. CLIFTON: Transcend is listed
3   there?
4      MR. CUTLER: Let me check here for you
5   if you just give me a second.
6      MR. CLIFTON: Sure.
7      MR. CUTLER: Yes, it's listed.
8   BY MR. CLIFTON:
9   Q  Okay. Is that a privately-held company?
10  A  Yes, it is.
11  Q  Okay. And what's your interest, ownership?
12     MR. CUTLER: It's listed in
13  Exhibit B-13 at 54 percent. There's a separate
14  Transcend Holding Company, LLC, listed in the
15  exhibit as well.
16     MR. CLIFTON: That's a separate
17  company, though?
18     MR. CUTLER: It appears to be.
19  BY MR. CLIFTON:
20  Q  You listed your 53-foot Hatteras boat and
21  stated that that had been repossessed or turned
22  back in to the lienholder May of this year?
23  A  Yes.
24  Q  Do you know where that boat is?
25  A  That boat is in Bayport, Minnesota at Bayport

Page 99

1   Marine.
2   Q  Do you have any pets, any animals?
3   A  Yes.
4   Q  What are they?
5   A  German Shepards.
6   Q  Were these the same animals that were talked
7  about in the Forbes magazine article of December
8  of '07?
9   A  I don't recall the article.
10  Q  Are these a special kind of dog?
11     MR. MOHRMAN: What do you mean by
12  special?
13     THE TRUSTEE: How much did you pay for
14  those dogs, Mr. Hecker?
15     THE DEBTOR: There's two dogs.
16     THE TRUSTEE: Okay.
17     THE DEBTOR: And they're primarily
18  security dogs for the family.
19     THE TRUSTEE: How much did you pay for
20  them?
21     THE DEBTOR: 30,000 apiece.
22     THE TRUSTEE: Okay. I don't see them
23  in the schedules. Is there a reason for that?
24     THE DEBTOR: They're family pets. My
25  wife claimed that they're hers and the

Page 100

1   children's.
2     THE TRUSTEE: Who paid for them, you?
3     THE DEBTOR: I believe it came from one
4  of my accounts.
5     THE TRUSTEE: Okay. Go ahead,
6  Mr. Clifton.
7  BY MR. CLIFTON:
8  Q  Came from what?
9  A  Came from my accounts.
10  Q  Okay. Where are these dogs located now, where do
11  they live?
12  A  Medina.
13  Q  And that address?
14  A  1492 Hunter.
15  Q  Is that where Tamitha lives?
16  A  Yes.
17  Q  And your children?
18  A  Yes.
19  Q  Okay. Are you separated?
20  A  Yes.
21  Q  Okay. On Schedule D, sheet four of seven, if you
22  want to look at that, you list Lake Bank of Two
23  Harbors as a secured creditor listing three
24  Silver Lake condominiums. Are these the Two
25  Harbors properties?

Page 101

1  A  Yes.
2  Q  Can you explain -- Well, first of all, are those
3  Two Harbor properties titled in your name or one
4  of your companies?
5     MR. CUTLER: Well, if you look at
6  Schedule A, you can determine if they're listed
7  as being owned by Mr. Hecker. And I don't
8  believe they're reflected on Schedule A, so I
9  believe the real estate records will reflect that
10  they're owned by a company that he directly or
11  indirectly owns. The best evidence on that would
12  be to check the real estate records.
13     MR. CLIFTON: Right, I realize that.
14  BY MR. CLIFTON:
15  Q  So the mortgages listed here, do you know if
16  those are mortgages either in your name or your
17  personal guarantee or in one of your companies?
18  A  Well, I personally guaranteed them.
19  Q  I was a little confused by this statement after
20  three Silver Lake condominiums. Security
21  interest asserted is half interest in household
22  goods. What do you mean there? Are we talking
23  about real property and personal property?
24     MR. CUTLER: Maybe I can address that.
25  If you read the mortgages, the mortgage contains

## Page 102

1    a grant of any personal property that's located
2    on the premises in favor of the bank. We believe
3    that the bank failed to file a UCC-1 financing
4    statement to perfect that. That's a legal issue.
5       MR. CLIFTON: So they were trying to
6    secure all personal property located at these
7    condominiums?
8       MR. CUTLER: The mortgage is a
9    combination mortgage and grant of a security
10    interest in personal property located at the
11    premises.
12       MR. CLIFTON: Okay.
13       MR. CUTLER: Kind of a standard form
14    document in Minnesota.
15       MR. CLIFTON: But you don't think they
16    perfected the UCC filing?
17       MR. CUTLER: That's correct. We
18    believe they have not filed a UCC statement.
19       MR. CLIFTON: Okay.
20       THE TRUSTEE: Mr. Clifton, when did
21    the -- I understand, and I get this from the
22    papers, I guess, but I understand that the IRS
23    filed a lien.
24       MR. CLIFTON: Yeah.
25       THE TRUSTEE: When was that?

## Page 103

1       MR. CLIFTON: Well, we have several
2    liens in different locations.
3       THE TRUSTEE: Okay.
4       THE TRUSTEE: And I don't need specific
5    dates now. If you could just --
6       MR. CLIFTON: No, I've got them here.
7       THE TRUSTEE: Okay.
8       MR. CLIFTON: The first one was filed
9    April 17th of this year in Hennepin County; the
10    next one was on May 8th in Washington County; the
11    same date in Crow Wing County; May 11th in
12    Maricopa County, Arizona; and -- Well, that's
13    it.
14       THE TRUSTEE: Okay. You can go ahead.
15 BY MR. CLIFTON:
16 Q   The property at 7175 East Camel Back Road,
17    Scottsdale, Arizona, you listed in your
18    Schedule B, personal property at that location,
19    not itemizing what it was or what its value was.
20    Was that property that earlier was stated had
21    been all transferred back here?
22 A   No, it's not. I don't believe so.
23 Q   Well, is there property in Arizona that was
24    transferred back here, is my understanding?
25 A   Yes.

## Page 104

1 Q   And was that from a different location?
2 A   Yes, from a different location.
3 Q   And what was that location?
4       MR. CUTLER: Was that a prior home that
5    you sold?
6       THE DEBTOR: It was a prior home,
7    Gainey Ranch.
8       MR. CUTLER: The street address was on
9    Gainey Ranch?
10       THE DEBTOR: Gainey Ranch, yes.
11 BY MR. CLIFTON:
12 Q   And when was that sold?
13 A   Sometime in '08, early '08.
14 Q   So personal property that was brought back to
15    Minnesota was from that location?
16 A   Yes.
17 Q   Gainey Ranch?
18 A   Yes.
19 Q   Okay. So is there still personal property at
20    this Camel Back address?
21       MR. CUTLER: Well, the schedules
22    reflect that there is. I don't understand your
23    question.
24 BY MR. CLIFTON:
25 Q   Well, I'm just clarifying that it is still

## Page 105

1    there. And can you be more specific --
2       MR. CUTLER: There's no testimony that
3    it's gone anywhere.
4 BY MR. CLIFTON:
5 Q   Can you specify what property is there and what
6    value it may have, or is that information that
7    you have turned over to Mr. Seaver?
8       THE TRUSTEE: On the Camel Back
9    property, Mr. Hecker, it says interest in an
10    unknown portion of household goods. What does
11    that mean; why is it unknown?
12       THE DEBTOR: The ownership is -- half
13    interest is owned by another party.
14       THE TRUSTEE: Who?
15       THE DEBTOR: Richard and Brent Olson.
16       THE TRUSTEE: Are they connected with
17    Royal Jewelers?
18       THE DEBTOR: Yes, they are.
19       THE TRUSTEE: Do they own Royal
20    Jewelers?
21       THE DEBTOR: I believe they have an
22    interest.
23       THE TRUSTEE: Okay. So did they
24    purchase some of the furniture in there?
25       THE DEBTOR: We bought the model

## Page 106

1    furnished.

2        THE TRUSTEE:  Okay.  So would it be

3    your view that -- Have you folks equally split

4    payments for this since the purchase?

5        THE DEBTOR:  I'm not sure I own it

6    personally or an LLC.

7        THE TRUSTEE:  And I'm not really asking

8    you that.

9        THE DEBTOR:  Okay.

10        THE TRUSTEE:  Well, since the purchase

11    have payments have been split between the Olsons

12    and you or the business entity?

13        THE DEBTOR:  The original intention was

14    that.  We haven't paid our share for about four

15    months.

16        THE TRUSTEE:  Okay.  Up to that time

17    did the original intention prevail?

18        THE DEBTOR:  Yes.

19        THE TRUSTEE:  Okay.  All right.  What

20    do you think the total value of those household

21    goods is?  I'm not asking about the allocation

22    between the parties now.  I'm just looking for a

23    rough idea of the value.

24        THE DEBTOR:  Well, we paid, I think,

25    two million -- two or four for the unit, and to

## Page 107

1    bring in a million eight right now.  So I don't

2    know what the value is.

3        THE TRUSTEE:  Was there an allocation

4    for personal property and real estate when you

5    bought the unit?

6        THE DEBTOR:  No.

7        THE TRUSTEE:  All right.  The personal

8    property, though, that's really what I'm asking

9    about here.

10        THE DEBTOR:  I --

11        THE TRUSTEE:  Just don't know?

12        THE DEBTOR:  -- don't know.

13        THE TRUSTEE:  Okay.  Go ahead,

14    Mr. Clifton.

15    BY MR. CLIFTON:

16    Q   When were you last at that property?

17    A   I believe 60 days ago.

18    Q   So you should have a good idea of what's there

19    for personal property?

20        MR. CUTLER:  Is that a question or a

21    statement?  If you want to ask him, does he have

22    an --

23    BY MR. CLIFTON:

24    Q   Do you have an idea of what's in that property

25    from your visit there 60 days ago?

## Page 108

1    A   Yes.

2    Q   So your testimony is that you have a half

3    interest in that property or one of your

4    companies has a half interest in that property,

5    the real property --

6    A   Yes.

7    Q   -- the real property, the real estate?

8        MR. CLIFTON:  I'm switching gears.

9        MR. CUTLER:  Let's just stop a minute.

10    You're asking multiple questions, so he needs a

11    chance to be able to respond before you go into

12    the next one.

13    BY MR. CLIFTON:

14    Q   Okay.  I'm asking about the real property at

15    Camel Back Road.  Who owns the real property?

16    A   Same people in all of the real estate.

17    Q   No.  I'm asking about the real estate.  Who owns

18    the real estate?  You said Royal Jewelers?

19    A   No.  I said Richard and Brent Olson.

20    Q   Okay.  And yourself individually?

21        MR. CUTLER:  Well, Mr. Clifton, I think

22    what we don't know -- what Mr. Hecker doesn't

23    know is whether it's held by him personally or in

24    a corporation that he owns directly or

25    indirectly.

## Page 109

1        MR. CLIFTON:  That's my question.

2        MR. CUTLER:  Mr. Hecker, you and/or you

3    and your wife have a 50 percent ownership

4    interest in that condo?

5        THE DEBTOR:  Yes.

6        MR. CUTLER:  And the other 50 percent

7    ownership interest is --

8        THE DEBTOR:  Yes.

9        MR. CUTLER:  -- the Olsons?  And is it

10    held directly by the Olsons or is it held in the

11    corporation?

12        THE DEBTOR:  I'm not sure.

13        MR. CUTLER:  If we researched the real

14    estate records, would it be reflected there?

15        THE DEBTOR:  Yes, it would.

16    BY MR. CLIFTON:

17    Q   Okay.  To clarify what you just asked him, I

18    think your question to him was whether him and

19    his wife owned --

20        MR. CUTLER:  I said and/or his wife, I

21    think.

22        MR. CLIFTON:  Individually.

23        MR. CUTLER:  What we're trying to

24    determine, Mr. Hecker, is whether you own that

25    condominium -- you have a personal interest in

Page 110

1   the condominium or whether it is owned in an
2   LLC.
3           THE DEBTOR: I don't know.
4   BY MR. CLIFTON:
5   Q   Okay. The Los Cabos property, I think we
6       established that was owned by a Jacob Holdings
7       entity?
8           THE TRUSTEE: I think we established
9   it's titled in the name of Jacob Holdings.
10  BY MR. CLIFTON:
11  Q   Right, okay. When were you last at that
12      property?
13  A   February or March.
14  Q   Okay. And was there personal property located
15      there at that time?
16  A   Yes.
17  Q   And you could provide an idea of what that
18      property is?
19  A   Yes.
20          THE TRUSTEE: Mr. Hecker, what do you
21  think that real property in Cabos would sell
22  for?
23          THE DEBTOR: Well, it's ten years old.
24          THE TRUSTEE: Yeah.
25          THE DEBTOR: I think we have on the

Page 111

1   schedule a number. I'm not sure.
2           THE TRUSTEE: I'm just asking you,
3   though, what you think.
4           THE DEBTOR: Five thousand or less.
5           THE TRUSTEE: Oh, I'm asking about the
6   real property, though.
7           THE DEBTOR: Somewhere between a
8   million and a million two.
9           THE TRUSTEE: Okay. Are there any
10  other units similar to that on the market down
11  there?
12          THE DEBTOR: Several.
13          THE TRUSTEE: Okay. And what are they
14  asking for those?
15          THE DEBTOR: Different units bring
16  different prices.
17          THE TRUSTEE: Right. I'm looking for
18  one similar to the one that you have. Are there
19  any of those on the market right now?
20          THE DEBTOR: There's no first floor
21  with the driveway and the parking lot in front of
22  it, no.
23          THE TRUSTEE: Okay. There are some the
24  same size, but not the same level?
25          THE DEBTOR: Yeah, the ocean view.

Page 112

1           THE TRUSTEE: Okay. Go ahead,
2   Mr. Clifton.
3   BY MR. CLIFTON:
4   Q   You listed two IRA accounts with balances as of
5       the end of December, and then there's a statement
6       in your filings that there was a liquidation in
7       April 30th of '09, I think on Schedule E, page 2?
8           MR. CUTLER: Schedule E?
9           MR. CLIFTON: I think that's where I
10  picked it up. Yeah. Well, it was listed -- You
11  listed it on Schedule E, page 2 of 4.
12          MR. CUTLER: There's a withdrawal
13  liability amount listed.
14          MR. CLIFTON: Right.
15          MR. CUTLER: Is that what you're
16  referring to?
17  BY MR. CLIFTON:
18  Q   Right. So there must have been a withdrawal on
19      April 30th of this year?
20  A   The plan was terminated.
21  Q   We're talking about your IRA accounts; is that
22      right?
23          MR. CUTLER: No. Actually, what you're
24  referring to refers to a 401(k) plan.
25          MR. CLIFTON: Not the IRAs?

Page 113

1           MR. CUTLER: On Schedule E.
2           MR. CLIFTON: Not the IRAs?
3           MR. CUTLER: That's a question to you,
4   I guess. Does this schedule -- Review this.
5   Does this refer to the 401(k) plan or to your
6   IRAs that are scheduled on Schedule B; is that --
7           THE WITNESS: I don't know.
8   BY MR. CLIFTON:
9   Q   So your IRA plans, you had two of them listed.
10      Have you liquidated any funds from those accounts
11      in 2009?
12  A   I don't believe so.
13  Q   Okay. You listed investment accounts of some
14      nature with Schmidt Barney, JP Morgan, UBS
15      Financial Services, Stifel Nicolaus and Citi
16      Smith Barney. Do you have any transactions with
17      any of those accounts since January of this year,
18      January 1st?
19          MR. CUTLER: Other than what's
20  reflected in the schedules?
21          MR. CLIFTON: Yeah.
22          THE DEBTOR: No, I don't think so.
23  BY MR. CLIFTON:
24  Q   Okay. On the SOFA, Question 6 --
25          THE TRUSTEE: You're referring to the

Page 114

1    Statement of Financial Affairs, right?
2         MR. CLIFTON:  Yes.
3         THE TRUSTEE:  Okay.
4  BY MR. CLIFTON:
5  Q    And maybe we already talked about this.  What
6     real property, specifically located, what are we
7     talking about with this statement, deeds in lieu
8     and voluntary surrender agreement?
9  A    1492 Hunter Drive in Medina.
10 Q    That's the only property we're talking about
11    there?
12 A    Oh, and Jacob Holdings of Aspen.
13 Q    And that real property is located where, under
14    Jacob Holdings of Aspen?
15 A    Aspen.
16 Q    Is that a condominium or town house?
17 A    Town house.
18 Q    So if I can understand what this statement says,
19    you've surrendered those properties to TCF?
20 A    The Medina property had a TCF first mortgage for
21    five million and a second mortgage with US Bank
22    for 12 million -- or seven million.  And TCF took
23    it back for five million, and US Bank didn't
24    exercise their option.
25 Q    On the Hunter property?

Page 115

1  A    Yes.  On the Aspen property they had a
2     $10 million mortgage, and TCF took it back with
3     an appraisal of eight million.
4  Q    Okay.  I think we established that CM Rowan and
5     Christi M. Rowan are the same person?
6  A    Yes.
7  Q    And in your list of transfers of property, there
8     was two entries to her, one for 65,000 and one
9     for 35,000.
10 A    They weren't all at one time.
11 Q    But they are to one person?
12 A    Yes.
13 Q    Okay.  What is French Lake Stables?
14 A    Are you referring to a check register?
15 Q    Yeah.
16 A    And how much is that for?
17 Q    $360.
18 A    I'm not sure whether the children went riding
19    there.  I have no idea.
20 Q    Do you own a horse?
21 A    No.
22 Q    Any interest in a horse?
23 A    No.
24 Q    Why would you have a payment to Florida Power and
25    Light?

Page 116

1  A    I was personally making the payments of an LLC
2     house that got repossessed that was owned by a
3     partnership.
4  Q    What was the partnership?
5         THE TRUSTEE:  Where was the home,
6  Mr. Hecker?
7         THE DEBTOR:  It was by Naples.
8         THE TRUSTEE:  Do you recall the
9  partnership?
10        THE DEBTOR:  The partner was, I
11 believe, Jeff Holmers.  It was an LLC, and I'm
12 not sure what the name of the company was.
13        THE TRUSTEE:  How do you spell that
14 last name?
15        THE DEBTOR:  H-O-L-M-E-R-S.  We can get
16 that information.
17 BY MR. CLIFTON:
18 Q    Is this one of the entities listed amongst your
19    250 or whatever that you're involved in?
20        MR. CUTLER:  Do you want to review the
21 schedule and see if it's listed there?
22        THE DEBTOR:  Yeah, let's read the
23 schedule.
24        MR. CUTLER:  It's going to take us
25 awhile.

Page 117

1  BY MR. CLIFTON:
2  Q    Could I ask a related question while you're
3     looking?
4         MR. MOHRMAN:  Well, why don't you let
5  them look.
6         MR. CUTLER:  Do you want him to look or
7  do you want him to answer the questions?
8         THE TRUSTEE:  Do you know who it is,
9  Mr. Dove; do you know who it is, what company it
10 is?
11        MR. DOVE:  Most likely it would have
12 been HHR of Copper Oaks, LLC.
13        THE TRUSTEE:  Does that sound right,
14 Mr. Hecker?
15        THE DEBTOR:  Yes.
16        THE TRUSTEE:  That was Erik Dove.
17        THE TRUSTEE:  Mr. Hecker, other than
18 these trips to Mexico, have you traveled outside
19 the country in the last two years?
20        THE DEBTOR:  Canada.
21        THE TRUSTEE:  Okay.  Other than Canada
22 and Mexico, have you traveled outside the country
23 in the last two years?
24        THE WITNESS:  Yes.
25        THE TRUSTEE:  Where?

## Page 118

1          THE DEBTOR:  To Germany.

2          THE TRUSTEE:  Okay.  And when was

3     that?

4          THE DEBTOR:  Maybe June and July of

5     '08.

6          THE TRUSTEE:  Okay.  Go ahead,

7     Mr. Clifton.

8          MR. CUTLER:  Can I ask a follow-up

9     question?

10          THE TRUSTEE:  Sure.

11          MR. CUTLER:  Was that for business for

12     Advantage?

13          THE DEBTOR:  Yes, it was.  It was for

14     the sale of Advantage.

15          MR. CUTLER:  And that was to speak to a

16     potential buyer --

17          THE DEBTOR:  Yes --

18          MR. CUTLER:  -- of the Advantage

19     Rent-A-Car --

20          THE DEBTOR:  -- Erich Sixt's

21     Rent-A-Car.

22          MR. CUTLER:  Did you conduct any

23     personal business while you were in Germany?

24          THE DEBTOR:  We flew over -- We left

25     here at five o'clock and got back at ten o'clock

## Page 119

1     the next night, there and back two times.

2          MR. CUTLER:  So you didn't conduct any

3     personal business while you were in Germany?

4          THE DEBTOR:  None.

5     BY MR. CLIFTON:

6     Q   Do you belong to the Wayzata Country Club?

7     A   Yes.

8     Q   And what's a membership there cost?

9     A   I have no idea.  I've owned it since 1978.

10          THE TRUSTEE:  Is that --

11          THE DEBTOR:  It costs $1,000 a month.

12          THE TRUSTEE:  Is that a transferable

13     membership?

14          THE DEBTOR:  I believe it has the same

15     kind of limitations that Spring Hill has.

16          THE TRUSTEE:  What's the initiation fee

17     there now; do you know?

18          THE DEBTOR:  I got in in 1978 for

19     20,000.  I believe that's what they'd buy it back

20     for if you got through the waiting list.

21          THE TRUSTEE:  Okay.

22     BY MR. CLIFTON:

23     Q   The question that I was going to ask while you

24     were looking up that Florida Power and Light

25     Partnership, Naples is in Lee County?  You have a

## Page 120

1     check to Lee County Treasurer.  Would that be for

2     that property or something else?

3     A   I would be guessing, but I presume it would be

4     that property.

5     Q   Is Naples in Lee County?

6     A   I have no idea.

7     Q   What's the Scottsdale Waterfront Association?

8     A   It's the association that operates the building

9     where the Camel Back property is.

10     Q   Does that property have access to a body of

11     water?

12     A   There's a river next to it, a man-made runoff

13     kind of deal.

14     Q   Okay.  Do you have a boat down there?

15     A   No.  There's no boats available on the --

16     There's -- It's a stream.

17     Q   Okay.  Silver Cliff Properties, are those Two

18     Harbors?

19     A   Yes.

20     Q   What's the Lafayette Club?

21     A   It's a social membership at Lafayette.  It's a --

22     In Minnetonka.

23          THE TRUSTEE:  Is there an initiation

24     fee for that?

25          THE DEBTOR:  I believe, Mr. Seaver,

## Page 121

1     when I got in five or six years ago, it was 2,500

2     or something nominal.

3          THE TRUSTEE:  Okay.

4          MR. CLIFTON:  Was your testimony that

5     you provided additional bank account records to

6     Mr. Seaver.

7          MR. CUTLER:  That wasn't my testimony.

8     I'm not here to testify.

9     BY MR. CLIFTON:

10     Q   Mr. Hecker, did you provide additional bank

11     account --

12          MR. CUTLER:  What I said on the record,

13     Mr. Clifton, was that we had provided the Trustee

14     with records that showed what the account

15     balances were on the date of filing.  And in

16     connection with gathering that information, there

17     were some additional accounts that weren't on

18     Schedule B.

19          MR. CUTLER:  And are those being

20     amended?

21          MR. CUTLER:  We've given that

22     information to Mr. Seaver.

23          MR. CLIFTON:  Are the schedules going

24     to be amended to reflect those?

25          MR. CUTLER:  You're asking me?

Page 122

1  MR. CLIFTON: Well, yeah. I guess that
2  would be your duty, wouldn't it, to amend the
3  schedules?
4  MR. CUTLER: Well --
5  MR. CLIFTON: Am I wrong? I mean --
6  THE TRUSTEE: Are you going to -- If
7  there are errors here, you're going to amend --
8  MR. CUTLER: We will amend the
9  schedules to correct any errors or omissions that
10 have been discovered here today.
11 MR. CLIFTON: The point is, how are
12 other creditors to know that there's been changes
13 in what was originally filed if you don't amend
14 them?
15 MR. CUTLER: I don't have a dispute
16 with you, sir, about the substance, but you're
17 putting the burden on me. I'm an attorney here
18 representing Mr. Hecker.
19 MR. CLIFTON: Okay.
20 THE TRUSTEE: Mr. Hecker, let me ask
21 you a question here and interrupt Mr. Clifton a
22 minute. Looking at the Statement of Financial
23 Affairs, I see a payment to something called
24 Ike's for $42,451 in November of '08. What's
25 that?

Page 123

1  THE DEBTOR: It was a loan to Ike's
2  Restaurant.
3  THE TRUSTEE: Did it ever get paid
4  back?
5  THE DEBTOR: No. He's file bankruptcy.
6  THE TRUSTEE: Okay. There's something
7  -- a payment of 19,500 to something called
8  Stardot, Inc., in October of '08. What's that?
9  THE DEBTOR: It was a margin call on a
10 portion of a company owned by ITR.
11 THE TRUSTEE: Okay.
12 THE DEBTOR: They closed the business
13 down and we each had a margin call of 19,5.
14 THE TRUSTEE: Mr. Clifton, back to
15 you.
16 MR. CLIFTON: I think I'm done.
17 FURTHER EXAMINATION
18 BY THE TRUSTEE:
19 Q  All right. I have a few more things,
20 Mr. Hecker. There are a number of transfers here
21 in the Statement of Financial Affairs to Bruce
22 Parker, Trustee. And, in specific, I'm looking
23 at, it looks like, October of '08, June of '08,
24 August of '08. What are those?
25 A  Kids' trusts that have life insurance on me, term

Page 124

1  insurance.
2  Q  Okay. It's an insurance policy on your life or
3  policies on your life?
4  A  Each one of them have a portion of a policy or a
5  policy. It's a term on my life.
6  Q  Okay. And you pay that; is that what these
7  checks are?
8  A  Yes.
9  Q  How much -- What's the amount of the policy?
10 MR. CUTLER: You mean the death
11 benefit?
12 THE TRUSTEE: Yeah, that's what I mean.
13 MR. CUTLER: I think there's several
14 policies.
15 THE DEBTOR: It's on the insurance
16 schedules that I think we provided to you.
17 MR. CUTLER: No. These are owned by
18 the trust.
19 THE DEBTOR: Oh, owned by the trust,
20 okay.
21 MR. CUTLER: Do you know what the face
22 amount of the death benefit of the insurance is
23 inside children's trusts?
24 THE DEBTOR: No, I don't.
25 BY THE TRUSTEE:

Page 125

1  Q  Okay. What other assets are in those trusts?
2  A  That's all.
3  Q  Just the insurance?
4  A  I believe so, yes.
5  THE TRUSTEE: Okay. Mr. Cutler, I
6  realize you're not testifying here, but --
7  MR. CUTLER: Thank you.
8  THE TRUSTEE: -- I sent a letter, and
9  then I'll address this --
10 Are you done, Mr. Clifton, completely?
11 MR. CLIFTON: I think so.
12 THE TRUSTEE: And I'll address this to
13 Mr. Hecker, too, but I had requested bank
14 statements going back to June 1st of 2008. And I
15 know that in your response to me, you indicated
16 that, you know, some records had been seized.
17 But today I have received from you the bank
18 account statements covering the date of filing,
19 which you're obligated and the debtor is
20 obligated to produce. Has any attempt been made
21 to get these other bank records that I've
22 requested?
23 So I'll direct it to you, Mr. Hecker, I
24 guess.
25 MR. CUTLER: I'm actually looking at

## Page 126

1    Mr. Castlebomb.  If I can confer with him.

2    THE TRUSTEE:  Sure.  What did you find

3  out?

4    MR. CUTLER:  Mr. Seaver, they are

5  working on gathering information.  We've been

6  getting numerous requests from you almost on a

7  daily basis, so we have to prioritize and triage

8  a little bit, but they are working on gathering

9  that information.

10    THE TRUSTEE:  Okay.  And just so we are

11  clear -- And I have been requesting a lot of

12  information, both me and my attorneys have been,

13  there's no doubt about that, but this was

14  something I sent a letter out back on June 16.

15  But I don't doubt that you're trying to get

16  those.  So as soon as you do, if you would send

17  them out.

18    MR. CUTLER:  Yes.  We've had numerous

19  events that have happened since then, including

20  on that date.

21    THE TRUSTEE:  I'm aware of that.

22    Are you Mr. Prohovsky?

23    MR. PROHOVSKY:  Yes, I am.

24    THE TRUSTEE:  Mr. Prohovsky, you're not

25  under oath here, of course, but have you paid the

## Page 127

1  rent on that Cross Lake place?

2    MR. PROHOVSKY:  Have I paid?

3    THE TRUSTEE:  Yeah, the 24,000?

4    MR. PROHOVSKY:  I'm waiting to get a

5  bill.

6    THE TRUSTEE:  So the answer would be

7  no?

8    MR. PROHOVSKY:  They haven't sent it to

9  me.

10    THE TRUSTEE:  Okay.  Well, when you pay

11  it, send it to Mr. Cutler to hold.  That's

12  that's property of this bankruptcy estate.

13  Okay?

14    MR. PROHOVSKY:  I will check with my

15  attorney and see if he agrees.  If he agrees,

16  yes.  If not, I'll do whatever --

17    THE TRUSTEE:  Sure.  I'm just telling

18  you if it goes elsewhere, I don't think that it

19  should go elsewhere.  But talk to your attorney,

20  of course.

21    MR. CUTLER:  There's another party that

22  I think will have an interest in that, which is

23  TCF.  They have an assignment of rents, I think,

24  on that property.

25  BY THE TRUSTEE:

## Page 128

1  Q  Sure.  Mr. Hecker, let me show you -- Well, let

2  me ask you this:  Do you recall in March of 2008

3  purchasing $47,000, roughly, of jewelry from

4  Chanel in Las Vegas?  It was a telephone

5  purchase.  Here, let me show you this.

6  A  Yeah, I guess, if that's what it says.

7  Q  And this was paid for with your American Express

8  black card, right?

9  A  Yes.

10  Q  All right.  Where did all of these items go; who

11  has them?

12  A  There's a gift to -- I'm not sure.

13  Q  A gift to who?

14  A  I bought them as gifts to give away.  I can find

15  out.

16  Q  All right.  Were they all -- And I won't go

17  through each one, but there are seven different

18  things on here.

19  A  If we can get a copy of that, we'll try and give

20  you an answer.

21  Q  You don't recall now who you gifted these things

22  to?

23  A  No.

24  Q  Would it have been one person?

25  A  It might have been several.

## Page 129

1  Q  Okay.  Mr. Hecker, we talked a little bit about a

2  property I think that your sister is living in --

3  A  Yes.

4  Q  -- do you recall that?  What's your sister's

5  name?

6  A  Liaini Jansen.

7  Q  How do you spell the first name?

8  A  L-I-A-I-N-I, J-A-N-S-E-N.

9  Q  Thank you.  Are you a signatory on any bank

10  account held in someone else's name?

11  A  No.

12  Q  Do you have access to moneys --

13    MR. CUTLER:  You mean other than the

14  companies?

15  BY THE TRUSTEE:

16  Q  Yeah, other than your companies.

17  A  No.

18  Q  And that's the way you were answering that,

19  right?

20  A  Yes.

21  Q  I mean, we all know you're a signatory on the

22  companies.

23  A  Yes.

24  Q  All right.  Do you have access to moneys in

25  anybody's account through use of ATM or

Page 130

1  otherwise?
2  A  No.
3  Q  Do you use any credit cards that are held in
4     anybody else's name, other than the company --
5     Well, let me just ask the question the way it
6     was. Do you have use of credit cards that are
7     held in anybody else's name?
8  A  I don't believe so.
9        THE TRUSTEE: Okay. Mr. Cutler, I'm
10     going to take a little break to check my notes.
11     I don't think I have a whole lot more, but I
12     think there were some items you wanted to
13     clarify.
14        MR. CUTLER: Do you want me --
15        THE TRUSTEE: Go ahead and do it now,
16     yeah.
17        EXAMINATION
18  BY MR. CUTLER:
19  Q  Mr. Hecker, generally with respect to the
20     preparation of the petition and schedules, you
21     were involved in gathering the information that's
22     reflected in the schedules; is that correct?
23  A  Yes.
24  Q  Your companies have some remaining employees; is
25     that correct?

Page 131

1  A  Three.
2  Q  And were those employees involved in supplying
3     the information that was used in preparation of
4     the schedules?
5  A  Yes.
6  Q  And did they --
7  A  Not all of them. They were part of the team.
8  Q  Okay. Who specifically assisted you in gathering
9     information for the schedules?
10  A  Susan Miller, Rich Hage, Greg Orthun, Danny
11     Storm, Darwin Lund, Erik Dove. I'm not sure
12     anymore.
13  Q  Do you believe the information that they gave you
14     was accurate?
15  A  Yes.
16  Q  Do you have any reason to think that it was not
17     accurate?
18  A  No.
19  Q  Is it possible that there were mistakes in the
20     information they gave you, but you're not aware
21     of those mistakes?
22  A  That's correct.
23  Q  With respect to your personal expenses prior to
24     the filing of the bankruptcy case, did you have
25     staff that took care of paying your personal

Page 132

1  living expenses?
2  A  Everything.
3  Q  And who specifically at your companies performed
4     those duties for you?
5  A  Susan Miller.
6  Q  And were you involved in directing, for example,
7     the payment of utilities at the various homes
8     that you used?
9  A  No.
10  Q  When the utility bills were sent, where were they
11     sent to? Did they come to 500 Ford Road?
12  A  They came to 500 Ford Road.
13  Q  And that's your business address?
14  A  Yes.
15  Q  And as far as you knew, Ms. Miller would process
16     the payment of any of those living expenses?
17  A  That's correct.
18  Q  Is that true also of the payment of your personal
19     credit cards?
20  A  That's correct.
21  Q  Property taxes associated with the properties?
22  A  That's correct.
23  Q  Payment of mortgages or other encumbrances on
24     those assets; is that correct?
25  A  That's correct.

Page 133

1        MR. CUTLER: That's all I have,
2     Mr. Seaver.
3        THE TRUSTEE: All right. I'm going to
4     take a short break here just to check my notes
5     and see if I have anything more. But is there
6     anybody else here who has questions? I know we
7     only had Mr. Clifton. Anybody else? Apparently
8     not.
9        FURTHER EXAMINATION
10  BY THE TRUSTEE:
11  Q  Before we take a break, let me just show you
12     something, Mr. Hecker. This is the insurance
13     policy for personal property, which there were
14     some -- there was some activity shortly before
15     filing, including termination, as I understand
16     it, of the jewelry coverage. But here's my
17     question: You will see that there's a received
18     date here of 6/5/09, $5,000 credit as a payment
19     on that policy. I'll tell you, I spoke with the
20     insurance -- the person at your insurance
21     company. My recollection is that he thought it
22     was a wire transfer. Do you know how that 5,000
23     was paid?
24  A  I have no idea.
25  Q  Okay. You didn't walk in and pay him $5,000; is

Page 134

```
 1    that true?
 2         MR. MOHRMAN:  In cash, you mean?
 3  BY THE TRUSTEE:
 4  Q   Cash, check.
 5  A   No.
 6         THE TRUSTEE:  Okay.  All right.  Let's
 7    just take a ten-minute break here and we'll come
 8    back.
 9         (Break taken.)
10  BY THE TRUSTEE:
11  Q   All right.  We're back on the record here now.
12    And you understand, Mr. Hecker, that you're still
13    under oath, correct?
14  A   Yes.
15  Q   All right.  Let me show you a printout that I got
16    from the Christi's real estate properties for
17    sale, luxury division.  This is a listing for a
18    residence at 3301 Las Ventanas.  Is that the same
19    complex your unit is in?
20  A   Yeah.  That's a third floor unit.
21  Q   Okay.
22  A   It might be a penthouse.
23  Q   Same building, though, right?
24  A   Same building, but it might be a penthouse.
25  Q   A more expensive unit?
```

Page 135

```
 1  A   Absolutely.
 2  Q   Okay.  And, Mr. Hecker, I've spoken to
 3    Mr. Cutler, I've spoken with him both yesterday
 4    and today about this and probably Monday, as
 5    well, but the lawsuit that I commenced to get
 6    turnover of that jewelry because of my concern
 7    about that insurance, I understand, based on your
 8    testimony here today, that you've turned over to
 9    me every piece of jewelry, watch, those sorts of
10    items, that you can locate; is that true?
11  A   That's correct.
12  Q   All right.  And because that action was to force
13    turnover of -- to get possession of those into my
14    custody and it appears to me that you've complied
15    that with everything, we've withdrawn the motion
16    that was scheduled for this afternoon and I'm
17    going to have my attorneys withdraw the lawsuit,
18    as well, because it was just for that limited
19    purpose.
20         THE TRUSTEE:  And, Mr. Cutler, excuse
21    me, you and I spoke about, there are various
22    documents here that I have requested, including
23    my initial letter where I'm requesting bank
24    statements.  And we've had a little discussion
25    about that, and other things have come up here
```

Page 136

```
 1    that I've requested and Mr. Hecker has agreed to
 2    produce, through you.  And you're going to
 3    produce all those, right?
 4         MR. CUTLER:  My client will produce
 5    those records, correct.
 6         THE TRUSTEE:  And then you'll pass them
 7    on to me?
 8         MR. CUTLER:  Yes.
 9  BY THE TRUSTEE:
10  Q   All right.  Mr. Hecker, you have met with an
11    agent of the estate, an auction agent named Fred
12    Radde, right?
13  A   Yes.
14  Q   And you've shown him various property, right?
15  A   Yes.
16  Q   At one of his visits at Cross Lake, he indicated
17    to me that he saw a car there, I thought he said
18    Mazeratti, a black expensive car, at any rate.
19  A   There was a black Range Rover there, but there
20    was no --
21  Q   But you don't recall there being a black
22    expensive car at your Cross Lake property?
23  A   Never.
24  Q   Okay.  And maybe I misunderstood him.
25         And I asked you about a Bentley and a
```

Page 137

```
 1    Mazeratti, and you told me about both of those.
 2    Have you had in your possession in the last three
 3    or four months any other expensive cars, let me
 4    just say any cars that would have cost over a
 5    hundred thousand new?
 6  A   Other than the Bentley we talked about?
 7  Q   Yeah.
 8  A   No.
 9         THE TRUSTEE:  Okay.  All right.  One
10    last chance, folks.  Does anybody have any
11    questions here?  It doesn't appear so.
12         So I am going to, subject to receiving
13    those documents, Mr. Cutler, I'm going to
14    conclude the Meeting of Creditors.  That's all.
15    Thank you.  Thank you everyone for coming.  Thank
16    you, folks.
17         (Whereupon, the proceedings were
18    concluded at 12:55 p.m.)
19
20
21
22
23
24
25
```

Page 138

```
 1   STATE OF MINNESOTA  )
 2
 3
 4   COUNTY OF HENNEPIN  )
 5
 6
 7
 8           REPORTER'S CERTIFICATE
 9
10
             I, Julie A. Rixe, do hereby certify
11
     that the above and foregoing transcript, consisting of
12
     the preceding 137 pages, is a correct transcript of
13
     my stenographic notes and is a full, true and complete
14
     transcript of the proceedings to the best of my
15
     ability.
16
             Dated July 20, 2009.
17
18
19
20
             JULIE A. RIXE
21           Court Reporter
22
23
24
25
```

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                                          BKY No.:  09-50779

Dennis E. Hecker,                                                          Chapter 7

        Debtor.

---

                                        Adv. Case No.:  09-5042

Randall L. Seaver, Trustee,

        Plaintiff,

vs.

Jacob Holdings of Ventanas LLC,
Jacob Properties of Minnesota LLC,
Wells Fargo Bank, Cornerstone Bank,
and Chrysler Financial Services Americas, LLC,

        Defendants.

---

## UNSWORN CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2009, I caused the following documents:

    *Trustee's Response to Debtor's Motion for Stay of Adversary Proceeding and Affidavit of Matthew R. Burton*

to be filed electronically with the Clerk of Court through ECF, and that the above documents will be delivered by automatic e-mail notification pursuant to ECF and this constitutes service or notice pursuant to Local Rule 9006-1(a).


                                  /e/  Stephanie Wood

Dated:  October 16, 2009                    _____

                                  Stephanie Wood
                                  100 South Fifth Street, Suite 2500
                                  Minneapolis, MN  55402
                                  (612) 332-1030

410911